ANCHOR COAL COMPANY *et al.* v. PUBLIC SERVICE COMMISSION *et al.*

(No. 9189)

Submitted May 6, 1941. Decided June 10, 1941.

440

*Brown, Jackson & Knight, Price, Smith & Spilman, Robert G. Kelly, Robert S. Spilman* and *Howard R. Klostermeyer,* for appellants.

*C. W. Strickling, Horace L. Walker* and *M. Carter Hall,* for appellees.

Fox, JUDGE:

This is a complaint of the Anchor Coal Company, Boone County Coal Corporation, and Colcord Coal Company, hereinafter referred to as "petitioners," operating on Coal River, against The Chesapeake and Ohio Railway Company, hereinafter referred to as the "railway company," complaining of rates of eighty-seven and eighty-

eight cents per ton from their mines to South Charleston. In the petition filed with the Public Service Commission on October 27, 1938, it is alleged that the present rates are unjust, unreasonable and prejudicial to the petitioners, and the maintenance of said rates is asserted to be a violation of law. Petitioners ask that an order be entered commanding the railway company to cease and desist from such alleged violation, and for such other and further orders as may be reasonable and just in the premises. An extended hearing was held and the Commission, in effect, denied their prayer and dismissed the petition, and we are now asked to review that action.

It should be said at the outset that this controversy involves a contest for access to the coal market in South Charleston, a manufacturing district, which consumes in excess of six hundred thousand tons of bituminous coal annually. Inasmuch as it is contended by the petitioners that the existing rates applicable to mines, other than those of petitioners, located in what is known as the Kanawha Coal District, bear upon the reasonableness of rates from petitioners' mines to South Charleston, it seems necessary, at this point to detail briefly the history of rates as applied to the Kanawha District, which includes Coal River and other competing mines.

What is known as the Kanawha Coal District includes mines and covers territory principally located west of Deepwater and south of the Great Kanawha River, including the territory drained by Coal River and Guyandotte River, the last known as the Logan field. Mines on Gauley River and on Elk seem also to be included in this district, but these mines are not directly involved in this proceeding. The Kanawha Freight Rate District covers roughly the same territory. Prior to September 17, 1923, rates were applied, except as to minor differentials, to all mines in this district as a unit. Prior to the date named a rate to Charleston of $1.03 per net ton was in effect on coal mined on Cabin Creek and Gauley branches of the Kanawha field, as well as certain mines on its main line, while at the same time the rate in effect from the Coal River field was $1.13 per ton, a differential against Coal

River of ten cents per ton. These rates were changed, effective as of September 17, 1923, and were reduced as to Cabin Creek mines and points on the main line west in Deepwater to eighty-eight cents, while the rates from Coal River and Gauley branches were reduced to ninety-eight cents, and from the Logan field and New River district the reduction was to $1.08. It will be observed that the ten cent differential against Coal River mines was maintained. On December 14, 1932, the rate on coal shipped from Coal River, the Kanawha Central Railway and Gauley branch was reduced to eighty-eight cents, with the indicated purpose of assisting the Coal River producers in meeting competition from Cabin Creek in the Charleston market. In Case No. 2228, by order effective June 30, 1934, the Public Service Commission reduced the eighty-eight cent rate to Charleston, from a portion of the mines on Cabin Creek to seventy cents, but the rate as to Coal River remained the same, thus creating a differential of eighteen cents against Coal River. This order was made on the 16th day of May, 1934, Twenty-First Annual Report Public Service Commission, 111, and from a reading of that report it will appear that cost of service and other pertinent matters were considered, and the result reached on the idea that the eighty-eight cent rate, as applied to the mines covered by the order, was unreasonable and should be reduced. This order was entered upon what appears to have been a complete appraisement of the entire rate situation in the Kanawha Freight Rate District. This was not the end of rate changes. At this point truck and water transportation entered the picture, and various shippers and consumers filed complaints seeking a reduction in rates, so far as they applied to Cabin Creek and the main line of the railway company east of South Charleston and west of Deepwater. In Cases Nos. 2381, 2382, 2383, and 2397, a joint order was entered on the 3rd day of February, 1936, Twenty-Third Annual Report Public Service Commission, 85, whereby the rate as to mines located on the Cabin Creek branch, its tributaries and subdivisions, to South Charleston was fixed at fifty-five cents, by consent of the railway company, the ship-

pers, and those who instituted the complaints. This was purely a consent order, and operators on Coal River were not parties to the proceedings in which it was entered. The defendant, The Chesapeake and Ohio Railway Company, at that time insisted that such a rate (fifty-five cents) would be less than a maximum reasonable rate, and it was there stated by the commission that "Having in mind, however, the findings of the Commission in previous cases, Nos. 2231 and 2228, to the effect that the carriers' eighty-eight cent group to the Charleston district as it formerly existed was too extensive and that a rate of eighty-eight cents had not been justified for the shorter distances involved in these cases, and also having in mind the actual competition now being encountered and probable future competition in the Charleston district with coal transported by water, and in order to effect a compromise adjustment along liberal lines which will be to the interest, not only of the complainants in the particular cases here under consideration, but also to the advantage of all other producers and shippers of coal in the origin territory here involved, as well as to the advantage of consumers in the Charleston industrial district, the defendant, The Chesapeake and Ohio Railway Company, is willing to consent to the establishment, by order of this Commission, of a group rate of fifty-five cents per net ton from the mines located on its lines, as hereinafter described, to South Charleston and Charleston, the average distance from said mines to South Charleston being approximately thirty miles."

It therefore clearly appears that the order of February 3, 1936, conceded nothing on the part of the railway company as to the reasonableness of the rate imposed, but was entered as a matter of compromise, and in what was believed to be the joint interest of the railway company, the shippers and the consumers in the Charleston industrial district. Whether this rate, so established, was an "approved" rate or a "prescribed" rate is immaterial. The rate was authorized and its effect on mines in other fields, competing with Cabin Creek, was the same whichever definition we adopt.

The establishment of other rates in the territory covered by the Kanawha district may be of interest. On March 23, 1936, the railway company established a domestic rate of eighty-seven cents from mines in the New River, Kanawha and Coal River fields to Huntington, West Virginia; and it voluntarily established a fifty-five cent rate from mines on Coal River, Cabin Creek and in the Logan field to river points at Huntington, covering shipments to these points for river transportation beyond that point. An eighty-seven cent rate was in effect as to one or more mines on Coal River to South Charleston. Distance being an element to be considered, it should here be stated that the average distance from Cabin Creek mines to South Charleston is 30.6 miles, and the average distance from mines of the petitioners to South Charleston is 57.9 miles. The distance from the Cabin Creek and Coal River fields to Huntington is somewhat greater than the distance from Coal River to South Charleston.

It will be observed from the foregoing that the final result of the rate changes has been to create a differential of thirty-two and thirty-three cents against Coal River and in favor of Cabin Creek. In all other respects the operators stand on an equal plane with other shippers in the Kanawha field. It will be noted that originally the ten cent differential as against the Coal River operators was considered fair in 1923, and later, when rates then existing were reduced to eighty-eight cents as to Cabin Creek, and ninety-eight cents as to Coal River. This differential was, of course, increased to eighteen cents when Cabin Creek's rates to Charleston were reduced to seventy cents, and a further increase to thirty-two and thirty-three cents resulted from the fixing of the fifty-five cent rate. By reason of this differential as against Coal River, it is established by the record that the petitioners have been practically barred from the South Charleston market, and that by reason thereof the same has been practically monopolized by those enjoying the benefit of the fifty-five cent rate from the Cabin Creek mines.

At the hearing all of the matters above stated were brought out, and evidence was introduced tending to show the cost of shipping coal from the Coal River mines to South Charleston. There was an admission by the railway company that the fifty-five cent rate from Cabin Creek to South Charleston, and the fifty-five cent rate from the Kanawha field, including Cabin Creek and Coal River, to Huntington, were both remunerative and compensatory. As a general proposition these two words are considered as meaning the same thing, although, technically speaking, there may be distinction between the two. Remuneration should include a fair profit on the performance of any service, and compensation for any service should also include such profit, although, strictly speaking, it may have a narrower meaning. We think it is established by the record that the railway company is not suffering a loss on account of services performed under these rates. The mere fact that it agreed to such a rate, rather than have its business taken away through truck and river competition, is some evidence that it is not suffering a loss from this business. The petitioners say that the evidence introduced by them as to cost of service shows that coal can be delivered from their mines to South Charleston at an expense not in excess of fifty-two cents per ton, and the admission that the fifty-five cent rates above mentioned are remunerative and compensatory, shows that the estimate of their witnesses as to cost is at least entitled to consideration, although, of course, it is quite clear that as to the shipments to South Charleston consideration should be given to the difference in the distances from South Charleston to Coal River and Cabin Creek. On the other hand, the railway company contends that the fifty-five cent rate to South Charleston and the rate from the Kanawha field to Huntington, for water shipment beyond, should not be used as comparisons in fixing rates for Coal River, for the reason that elements other than those involving reasonableness of rates and cost of service necessarily enter into the fixing of these lower rates. While general conditions as to shipping and cost of service would appear to be practically

the same, the mines covered by the different rates being the same, and operated by the same company, it is nevertheless true that the competitive element should enter into the question of whether the case is one for proper comparison. But for the admission by the railway company that the lower rates mentioned are remunerative and compensatory, we would not be inclined to give serious weight to the idea of comparison; but in the absence of clear evidence as to cost of service, one of the things which the statute says must be considered, we cannot escape the force of the contention that the admission that these lower rates, under practically similar circumstances, are remunerative and compensatory, should be considered as a basis for the determination of what would be a reasonable rate for other mines in the Kanawha field, and to that limited extent, at the least, they should have been considered. Criticism is directed by the railway company at the evidence offered by petitioners bearing on the cost of service; and the petitioners, in turn, criticize the failure of the railway company to furnish information alleged to be within its control as to such cost. Waiving these criticisms, we have proof of actual costs in contiguous territories, in some instances on the same lines of railway, and in all cases under similar general conditions, where particular rates are admitted to be remunerative and compensatory, and to hold that these may not be used as comparisons in the matter of arriving at costs is to ignore what is probably the best available evidence on the subject. The evidence introduced by the petitioners as to cost was severely criticized, but the railway company did not undertake to show cost, contending that it was impossible to do so. This contention may be true, so far as it means that a detailed showing of cost as to shipments under consideration can be furnished, but this does not mean that a fair estimated cost cannot be reached. If this could not be done, there would be no reasonable basis upon which rates could be prescribed in any case. In *Freight Forwarding Investigation,* 229 I. C. C. 201, 311, it was stated, "while no cost study can be precisely accurate or immune from valid criti-

cism, the results of these studies are not far removed from the truth."; and while we express no opinion as to the reliability of the figures used by the petitioners' witnesses as to cost, we do say that these figures, along with a proper consideration of the comparisons which may be made, as above indicated, should have been given greater consideration than they appear to have received at the hands of the commission. *Hope Natural Gas Co.* v. *Public Service Commission,* 112 W. Va. 223, 164 S. E. 248. The commission, in considering this point, quoted from an Interstate Commerce Commission case, *Property Owners' Committee* v. *Chesapeake & Ohio Railway Co.,* decided March 5, 1940, wherein the Commission in discussing certain evidence said, "in view of the infirmities in complainants' cost figures previously referred to, we cannot accept them as representing even the approximate cost of the transportation service under the rates assailed."; and then states: "We feel that a similar conclusion is fitting here.", thus showing that it gave no substantial consideration to any of the evidence introduced by the petitioners as to cost, or to the matter of comparison of rates. In assuming this attitude, we think the commission erred.

That the commission failed to take into consideration the evidence produced as to cost of service, and that it did not enter into that question to the extent of permitting it to bear upon the final conclusion reached, is best evidenced by the commission's report. In discussing the question of costs, it said:

> "* * * Suffice it, however, to say that in consideration of all the cost evidence we could not possibly make a finding that the cost to the defendant for furnishing the services herein involved is as low as $0.5165, the highest estimate made by the witness Saunders, or 55 cents, the existing rate from Cabin Creek mines, and we do not say that the cost of service to the defendant may not in fact be substantially higher than fifty-five cents."

Further the commission states:

"\* \* \* Therefore, it conclusively appears from the testimony of the complainants' witnesses, from this record, and is manifest, that the maximum value of the service to the complainants, except for sporadic shipments of so-called 'distress' coal, is 55 cents per net ton or a rate closely comparable thereto, and that unless such a rate is justified, the Commission, although it could lawfully reduce the existing rates, could not give the complainants any stabilized or permanent relief unless such reduction resulted in a rate comparable to 55 cents per net ton."

And finally it is stated:

"\* \* \* Since practically all coal would have moved, even from the 70-cent rate group, to South Charleston by water or highway it cannot be said that the complainants could have shipped any appreciable amount of coal to the Charleston market on an 88-87-cent rate, hence the filing of the 55-cent rate did not adversely affect them."

Witnesses for the petitioners admitted that over a long period of time the Coal River mines could not compete in the Charleston market, at a rate substantially greater than fifty-five cents—that enjoyed by the Cabin Creek operators. However, they stated that the smaller the differential against them, the greater would be the opportunity for competition in that market. The record shows that the greater part of the coal consumed in the South Charleston industrial district is nut or slack coal, which operators have difficulty in marketing, but which they necessarily produce in connection with the larger sizes used generally for domestic purposes; so we think it fair to say that to a certain extent, at least, the Coal River operators are interested in a reduction of the present rate, even though that reduction might not go to the extent of placing them on an equal plane with the operators in the Cabin Creek field. We can only construe the commission's order to mean that, inasmuch as they could not

establish a rate as low as fifty-five cents, the establishment of any substantially higher rate would be of no value to the Coal River operators, therefore, why disturb the existing rate. For reasons hereinafter to be stated, we cannot agree that this was the principle upon which this complaint should have been decided.

Early in the history of our Public Service Commission, this Court in *United Fuel Gas Co.* v. *Public Service Commission,* 73 W. Va. 571, 80 S. E. 931, held that its jurisdiction was not appellate but original, and recognized certain restrictions upon its power to pass upon actions of the commission. That holding was based upon the decision of the Supreme Court of the United States, applying to the Interstate Commerce Commission, in *Commission* v. *Union Pacific Railway Co.,* 222 U. S. 541, 32 S. Ct. 108, 56 L. Ed. 308, and has been followed in *Pittsburgh & West Virginia Gas Co.* v. *Public Service Commission,* 101 W. Va. 63, 132 S. E. 497; *City of Huntington* v. *Public Service Commission,* 101 W. Va. 378, 133 S. E. 144, and other cases.

Under these holdings we do not interfere, on review, with the action of the commission, unless it has exceeded the power which it could constitutionally exercise, has gone beyond its statutory powers, or its action is based upon a mistake of law. However, this does not exclude the right to correct a decision of the commission where it has failed to give consideration to evidence proper to be considered, and failure to consider such evidence may be classified as a mistake of law. It is not a function of this Court to fix the rate which should be applied to shipments by petitioners to South Charleston, and we disclaim any power to do so. That is a legislative duty delegated to the Public Service Commission, and there it should remain.

But when a rate is attacked, it is the clear duty of the commission to investigate the complaint, hear testimony and argument, and then decide whether the rate under attack shall remain undisturbed, be reduced, or increased. The paramount purpose of the creation of the commission was to protect all interested parties in the main-

tenance of reasonable rates, tolls and charges by those coming within the purview of its authority, and nothing less than a hearing and decision on the question will serve to carry out that primary purpose. When such attack is made the commission in its investigation, hearing and decision is bound by the statute, Code, 24-3-1, that "All charges, tolls and rates shall be just and reasonable"; and Code, 24-2-2, which provides that "in no case shall the rate, toll or charge be more than the service is reasonably worth, considering the cost thereof." Any attack on a rate must necessarily rest on the contention that it is either unreasonable, or otherwise discriminatory and prejudicial. If neither, there can be no ground for attack. While the duty of the commission to fix a reasonable rate is clear, in the very nature of things it would not interfere with, or be warranted in disturbing a reasonable rate or one non-discriminatory. Therefore, the contention that the commission must, in the first instance, find that the rate under attack is unreasonable, before it can proceed to prescribe a different rate, is well taken; but the finding of unreasonableness or discrimination and the substitution of a reasonable and non-discriminatory rate are one and the same process and can be applied in the same proceeding. Applying this theory to the case at bar, we think the Public Service Commission could only have been warranted in prescribing a lower rate for Coal River shipments than the one now in effect in case it was of the opinion that the present rate was unreasonable. It is contended by the railway company that the commission did not so find, and, therefore, it could not under the law fix a lower or different rate. Petitioners contend that in failing to disturb the existing rate the commission, being by law required to prescribe a reasonable rate, necessarily found the existing rate to be reasonable, and that in doing so it ignored evidence proper to be considered, and wholly failed to take into consideration the cost of the service under consideration, and that its finding was erroneous. Viewing the matter from a practical standpoint, we think that when the commission refused to disturb the existing rates it, in effect, held that

they were reasonable. The only question remaining is whether or not upon the record as presented such ruling was proper.

We are of the opinion that the ruling of the Public Service Commission should not be sustained. Without indicating what we think is a reasonable rate on the testimony produced, we do say that, based on the record as it stands, the present rates are unreasonable, and that the commission should have so held. It follows that it was the duty of the commission to fix a reasonable rate. Inasmuch as this case must be remanded to the Public Service Commission, it is now its duty to consider the testimony already presented, together with such other testimony as may hereafter be produced, and then, in the light of the whole record, determine the rate which should be prescribed.

The order of the Public Service Commission entered on the 24th day of August, 1940, is reversed and the case remanded for further proceedings.

*Reversed and remanded.*