STATE EX REL. INDEPENDENT SCHOOL DISTRICT NO. 6,
MORRISON COUNTY, v. J. B. JOHNSON AND OTHERS,
AS STATE BOARD OF EDUCATION, AND ANOTHER.[1]

July 30, 1954.

No. 36,140.

*Gordon Rosenmeier* and *John E. Simonett,* for appellant.

*J. A. A. Burnquist,* Attorney General, and *Charles E. Houston,*
Assistant Attorney General, for respondents.

DELL, CHIEF JUSTICE.

Appeal from an order of the district court in a matter which came
on for hearing before that court on a writ of certiorari. We are here
concerned only with that part of the order in which the action of
the state board of education in denying aid to Independent School

[1]Reported in 65 N. W. (2d) 668.

District No. 6 of Morrison county for the school year 1950-1951 was affirmed as to the Pierz school. The state board of education will be referred to herein as the state board; the school board of Independent School District No. 6 as the district board; and the commissioner of education as the commissioner.

There is no controversy as to the "Statement of Facts," which is referred to in the record as exhibit 2. We shall refer to the facts here as far as they pertain to the Pierz school.

Independent School District No. 6 of Morrison county was organized December 19, 1949. Early in January 1951, members of the district board sought advice from the state department of education on problems of reorganization and administration. As a result of this request, one Roy H. Larson of the department of education visited the schools of district No. 6 on February 26, 1951. On April 19, 1951, without warning, a letter was sent to the district board by Larson stating that as a result of his investigation state aid for the Pierz school would be withheld. Action by the state board in awarding or withholding an award of state aid to district No. 6 was deferred for further consideration. Later, discussions were held between the commissioner, the attorney general, and the attorney for the district board to determine the actual facts existing at the time of the Larson letter or report, which are not in serious dispute. The "Statement of Facts" was thereafter prepared in an attempt to present to the state board uncontroverted facts upon which was raised the question whether such facts precluded the award of state aid. While the district operated nine schools during 1950-1951, the report alleged deficiencies as to only two of those schools, one of which was the Pierz school.

According to the "Statement of Facts," the Pierz school was in common school district No. 14 before the reorganization. For many years that district had rented schoolrooms in the parochial school building owned by St. Joseph's Church in Pierz. Pending further reorganizational efforts, the new Independent School District No. 6 continued this rental arrangement during its first year of operation. Two rooms were leased, and grades three through six were taught.

The parochial school operated grades one through eight in its part of the building. In the public schoolrooms so leased there were displayed on the walls of the third and fourth grade classroom a crucifix and three religious pictures, and a crucifix and two religious pictures were hung on the walls of the fifth and sixth grade classroom. These crucifixes and pictures had been in the classrooms for many years. They were not placed in the rooms by either public or parochial school authorities during the public school administration. During the years that the rooms were used for public instruction, removal was simply neglected. There was a holy water font at the entrance to each room, but these fonts were rarely used and then only by a few pupils. Like the pictures, their removal was simply neglected.

There is a public school record system known as the "Flynn-Untne" simplified record system. Form 1 of this system used by the district was a permanent school record. Form 3 was used for report cards. A grade for religion was reported on this form, apparently because of parental interest. Apart from the public school records, the teachers in the Pierz public school had in their possession for each Catholic student attending the public school a form entitled "Permanent Elementary Grade Record—Diocese of St. Cloud." This form was devised to furnish information of a religious nature, which was compiled by parochial authorities during attendance in the preceding parochial school grade. It was not a part of the public school record system but was used by the parochial school for its own pupils. The form was in the possession of public school teachers because the grades of pupils transferred from parochial schools were reported thereon and were helpful in gauging prior schoolwork and abilities of pupils. Public school teachers inserted public school grades of a pupil on the form as a matter of comity for information of the parochial school teacher to whom the pupil might be transferred in subsequent grades.

Public school children used the parochial school library but at different times than the parochial school children. The pupils were permitted to select their own books, and there was no urging that

library books of a Catholic nature be read. Pupils from each school had their own section of the playgrounds.

Religous instructions in the Catholic faith were given one-half hour each day to public school students whose parents requested it. On oral argument it appeared undisputed that these instructions were given on release time and had been discontinued by December 1950, a few months after school began under the reorganization. While, as a matter of convenience, these instructions were usually given in the public classrooms, public school teachers did not consider it part of their duties to be present at such times because every pupil had requested such instructions. Religious instruction in the public schoolrooms was not authorized by the district board or by the superintendent.

During the year 1950-1951 all public school children attending the Pierz public school, with the exception of one student, were Catholic. Non-Catholic students who completed the sixth grade in the public school at Pierz were, at the request of their parents, transported to the Little Falls public school for instructions in the seventh and eighth grades at the expense of the district; there was one such student transported during the 1950-1951 school year.

The teachers in the parochial classrooms at Pierz were members of a religious order and wore a religious garb. The teachers in the public schoolrooms were laywomen, qualified public school teachers, and wore no religious garb. The courses of instruction in the public schoolrooms were prescribed by the public school authorities. There was no supervision or interference by church authorities as to the operation of the public school.

It was agreed in the "Statement of Facts" that all of the asserted wrongful practices would have been corrected promptly if they had been called to the attention of the public authorities. When finally advised by the department of education to make certain corrections, the district board immediately made them. The same schools were operated during the school year 1951-1952 and were found by the state department of education to conform satisfactorily to all rules and regulations.

The following are the state board rules to which reference is made in the petition for the writ of certiorari:

"2. Procedure for Withholding Classification and Approval

"a. Advisement

"After a school or a special department has been visited a written report regarding its condition shall be made to the school authorities by the person or persons who made the visit. In that report the school authorities shall be advised of any matters that are in need of correction.

"b. Warning

"If the advisement is not heeded, the school authorities shall be warned that the school will not be recommended for classification or that the special department will not be recommended for approval. The time limit for such correction may be specified, depending upon the nature of the irregularity.

"c. Action to be taken

"If no improvement is made after one or more warnings, the school will not be recommended to the State Board of Education for classification, or the special department will not be recommended for approval."

More than a year after the practices complained of at Pierz had been corrected, the commissioner recommended to the state board at its meeting on August 4 and 5, 1952, that the claim for state aid by Independent School District No. 6 of Morrison county for the school year 1950-1951 in the amount of $16,924.40 be denied.[2] That sum included $7,072.80 basic aid and $9,851.60 transportation aid for consolidated schools. This aid has been held in abeyance since August 3, 1951.

In his recommendation to the state board with reference to the school district's claim to receive state aid for the school year 1950-

[2] $2,032.80 of that amount was the aid withheld in connection with the Buckman school, not under consideration here except to say that district No. 6 was paid the $2,032.80 following reversal by the district court of the action of the state board in withholding aid to the Buckman school upon the commissioner's recommendation.

1951 for the Pierz school, the commissioner took the position that the "Statement of Facts" (exhibit 2) clearly indicated that the conditions set forth therein existed throughout the major part of that school year. He further said that the arguments and elucidation of facts presented by the attorneys before the state board on July 14, 1952, lead to the conclusions that the rules of the state board of education are not a controlling factor in the case; that the statutes are only partially controlling; and that Minn. Const. art. 8, § 3, par. 2,[3] is fully controlling. He further concluded that the "Statement of Facts" showed plainly that in the Pierz school actual denominational religious teaching was conducted daily in violation of the statute and constitution and that it appeared conclusively that in that school, through the influence of denominational religious symbols and texts, the distinctive denominational religious teachings of a particular religious sect were promulgated. He thereupon recommended to the state board that the claim for aid by Independent School District No. 6 in the Pierz school be denied by official action. Acting upon his recommendation, the state board denied the claim.

M. S. A. 1949, c. 128, pertains to state and federal school aids. Section 128.01 thereof specifies that for the purpose of aid to public schools two funds are established: (1) The endowment fund consisting of income from the permanent school fund; and (2) the special state aid fund consisting of the amount transferred from the income tax school fund and other sums appropriated by the legislature for aid to public schools. We are here concerned only in the latter fund. M. S. A. 1949, § 128.05, provides that the state board of education shall distribute the special state aid fund in such manner and upon such conditions as will enable school districts to perform efficiently the services required by law and to further educational interests of the state. It grants the state board power to fix reasonable requirements for receiving and sharing in the state

---

[3]"But in no case shall the moneys derived as aforesaid, or any portion thereof, or any public moneys or property, be appropriated or used for the support of schools wherein the distinctive doctrines, creeds or tenets of any particular Christian or other religious sect are promulgated or taught."

aid. The special state aids which are involved in this case are of two types, termed respectively basic and transportation aid.

M. S. A. 1949, § 128.081, subd. 3, defines basic aid in terms of the formula for determining the amount of such aid to which each school district is entitled. It reads:

"Basic aid is the sum *required to be paid to a school district* which, when added to the sum paid to the district as apportionment shall total a sum equal to $50 multiplied by the total number of pupil units of the district, provided, however, that for each year of the biennium beginning July 1, 1949, only, such aggregate sum shall be $56 multiplied by the total number of pupil units of the district." (Italics supplied.)

M. S. A. 1949, § 128.07, provides for the payment of transportation aid to qualifying consolidated districts "at rates to be determined by the state board of education" within certain maximum limits. It therefore appears that § 128.081, subd. 3, intends that the amounts of basic aid to which any school district is entitled shall be determined by a mathematical formula and § 128.07 provides that the transportation aid in qualified districts shall not exceed the maximum amount per pupil set forth in the statute. Although § 128.07 permits the state board, within certain limits, to determine the rates for payment of transportation aid, it is clear that the withholding of aid in connection with the Pierz school is not a result of the exercise of the discretion to determine rates but is based on other reasons which the commissioner and state board considered proper.

M. S. A. 1949, § 128.18, describes the manner of payment of special state aids as follows:

"Subdivision 1. **Manner of payment.** The special state aid fund and all other sums made available by the legislature as special state aid to schools shall be paid in the following manner.

"Subd. 2. **Distribution to counties.** On or before October 1 in each year, it shall be the duty of the commissioner of education to deliver to the state auditor a certificate in duplicate for each class of schools in each county of the state entitled to receive state aid

under the provisions of this chapter. Upon the receipt of such certificate, it shall be the duty of the state auditor to draw his warrant upon the state treasurer in favor of the county treasurer for the amount shown by each certificate to be due to the several schools therein enumerated. The state auditor shall transmit such warrants to the county auditor together with a copy of the certificate prepared by the commissioner of education."

Upon first glance there would appear to be some conflict between § 128.05 and § 128.18. The former statute provides that the state board shall distribute the special aid fund, with power to fix reasonable requirements for receiving and sharing in the state aid, while § 128.18 says that it shall be the duty of the commissioner to deliver to the state auditor a certificate in duplicate for each class of schools in each county entitled to receive state aid. However, it is our opinion that § 128.18 should be considered together with M. S. A. 1949, § 120.06, which defines the duties of the state commissioner of education in part as follows:

"The state board of education shall elect a state commissioner of education who shall be the executive officer and secretary of the board * * *. He shall perform such duties as the law and the rules of the state board of education may provide and be held responsible for the efficient administration and discipline of the various offices and divisions in the organization of the department of education. He shall be required to make recommendations to the state board of education which shall facilitate all of the work of the board, and he shall be charged with the execution of powers and duties which the state board of education may prescribe, from time to time, to promote public education in the state, to safeguard the finances pertaining thereto, and to enable the board to carry out conclusively the provisions of this chapter."

As we interpret these provisions, the commissioner, in performing his duties under § 128.18, is acting under the direction of the state board, which is the body authorized by § 128.05 to make the distribution of special state aids. In that capacity it is his duty to

deliver to the state auditor a certificate in duplicate for each class of schools in each county entitled to receive state aid under the provisions of c. 128. The class of schools to receive basic aid must be determined in accordance with the formula provided in § 128.081, subd. 3, and those receiving transportation aid must be determined as provided in § 128.07.

The strongest argument for the existence of the authority to withhold special aid in the manner attempted here is found in § 128.05 empowering the board to "fix reasonable requirements for receiving and sharing in the state aid." However, we do not find even this argument persuasive. It is probable that the state board could, under this section, establish a requirement that any school operated in violation of Minn. Const. art. 8, § 3, should forfeit its right to special state aid. However, we do not deem it necessary under the circumstances here to determine whether such a requirement would be reasonable. It must be remembered that during the period involved in this case there was not only no such rule in existence, but, in addition, there already was in existence a series of rules of the state board which in our opinion prohibited the refusal to certify aids in the manner attempted here.

Rule 2 of the state board, *supra*, also found at p. 24 of the "Manual of Standards for all Public Schools," is entitled "Procedure for Withholding Classification and Approval." It provides that after inspection of a school it shall be advised in writing of matters which are in need of correction; that if the advisement is not heeded the school shall be warned that it will not be recommended for classification unless the correction is made within a specified time; and that if no improvement is made after one or more warnings the school will not be recommended to the state board for classification.

It is conceded by all parties that in this case there was no attempt to follow this procedure. An official of the department of education visited the schools in question on February 26, 1951, and on April 19, 1951, without prior warning, the school board was notified that state aid would be withheld. Moreover, the agreed "Statement of Facts" provides:

"All of the asserted wrongful practices would have been corrected promptly if they had been called to the attention of public authorities. When finally advised by the Department of Education to make certain corrections, the school board immediately made them."

These rules of the state board were filed with the secretary of state on September 3, 1946, and have the force and effect of law. M. S. A. 15.01 and 15.042, subd. 3. See, Senske v. Fairmont & Waseca Canning Co. 232 Minn. 350, 355, note 2, 45 N. W. (2d) 640, 645, note 1; see, also, Kroger Grocery & Baking Co. v. Glander, 149 Ohio St. 120, 77 N. E. (2d) 921. It has been held that a validly adopted administrative rule becomes a part of the statute under which it is adopted (Lilly v. Grand Trunk Western R. Co. 317 U. S. 481, 63 S. Ct. 347, 87 L. ed. 411; Willams v. New York Cent. R. Co. 402 Ill. 494, 84 N. E. [2d] 399), and it is well settled that such rules bind even the agency which adopted them. Germania Iron Co. v. James (8 Cir.) 89 F. 811; Sheridan-Wyoming Coal Co. Inc. v. Krug, 84 App. D. C. 288, 172 F. (2d) 282, reversed on other grounds, 338 U. S. 621, 70 S. Ct. 392, 94 L. ed. 393; People ex rel. Bergquist v. Gregory, 337 Ill. App. 661, 86 N. E. (2d) 434; Matter of Poss v. Kern, 263 App. Div. 320, 32 N. Y. S. (2d) 979. Even though the adopting of the rule was a discretionary function, once the rule is in force the adopting agency does not have discretion to disregard it. Thompson v. Spear (5 Cir.) 91 F. (2d) 430.

Thus, it is clear that, although § 128.05 may vest the state board with a substantial amount of discretion in the distribution of the special state aid fund, it is our opinion that the board did not have the authority to proceed in the manner it did here in withholding aids, in view of its own rules which were applicable during the period involved. Rather, it is our opinion that the state board should have followed its own rules in this instance and advised the district board of the matters needing correction. Here, there were no such advisements or warnings to the district board as provided in the state board rules. Even so, the record shows that the complained of practices continued for only a short time and were discontinued as soon as the attention of the district board was called

to them. They were neither authorized nor instigated by the district board. It is our conclusion that a fair construction of our constitutional prohibition of teaching religion in our public schools and our statutes relating to state aid should require some opportunity for the correction of practices, such as apparently existed here, before the commissioner of education denies a school district state aid. We therefore conclude that under the circumstances here the aid involved should not have been denied.

Reversed.