VIRGINIA ELECTRIC AND POWER CO.

*v.*

THE PUBLIC SERVICE COMMISSION OF W. VA.

(No. 14050)

Decided April 4, 1978.

*Jackson, Kelly, Holt & O'Farrell, F. Paul Chambers and Michael A. Albert, Hunton & Williams, Guy T. Tripp, III and Moira K. Donoghue*, for petitioner.

*C. Terry Owen, Legal Division, Public Service Commission*, for respondent.

HARSHBARGER, JUSTICE:

This is an appeal by Virginia Electric and Power Company from a final order of the West Virginia Public Service Commission granting Vepco a rate increase of $330,000 of a requested $1,770,000.

Vepco is engaged in the electric utility business in West Virginia and North Carolina and in the electric and

gas business in Virginia. It furnishes retail electric service to 18,960 customers in five counties and eight municipalities in West Virginia.

## I.

The Company assigns as errors the Commission's method of allocating to West Virginia rates, its operating expenses pertaining to electric transmission and distribution facilities in West Virginia; and the method of allocation used by the Commission in dealing with tax credits.

## A.

The company books show several accounts that make up distribution expenses. For example, it has an account numbered 583 for company-wide "Overhead Line Expenses." It chose to establish West Virginia overhead line expense by comparing the "value" of West Virginia overhead lines with the "value" of company-wide overhead lines. It determined that its West Virginia overhead lines represented 2.81% in "value" of all its overhead lines. It reasoned, then, that 2.81% of company-wide overhead line *expense* of $2,065,292 should be allocated to its West Virginia overhead line expense ($58,082).

The Commission, however, added all the company distribution expenses and allocated to West Virginia the proportion of those expenses that the West Virginia total plant bears to the entire company plant, 1.5621% being the factor. Applying 1.5621% to the company-wide distribution expense resulted in $41,423 being allocated to its West Virginia operating expenses.

Vepco contends that its method is more precise. And in this case, its method would add about $73,000 to its West Virginia operating expenses, a part of its rate structure here.[1]

---

[1] The Company, to illustrate the advantages of its method of allocation, compared the expense of maintaining overhead distribution lines (with which West Virginia abounds) and the expense of

It is obvious to us that the basic factoring premise used by both parties is very imprecise. The use of factors to apportion expenses, based upon West Virginia plant compared to total company plant—whether finely categorized as to "overhead," "underground" or what not, is it seems to us, presumptuous. For example, a new line built in West Virginia at a cost of $100,000 per mile would become part of West Virginia plant. Yet because of its modernity it should require much less maintenance expense than, say, a line in North Carolina built thirty years ago when the cost was $10,000 per mile. Any attempt to allocate to West Virginia rates, distribution expenses on the basis of a ratio of plant-to-plant, whether by separate distribution expense accounts or total distribution expense accounts, is therefore inherently inaccurate. But apparently the method is the best that can be devised, and we must abide with it without something better being presented to us. However, given the lack of a more precise basic formula, there is no reason for us to require any more precision in calculations than the Commission has in its method.

> The principle is well established by the decisions of this court that an order of the public service commission based upon its findings of facts will not be disturbed unless such finding is contrary to the evidence, or is without evidence to support it, or is arbitrary, or results from a misapplication of legal principles. *Boggs v. PSC*, 154 W. Va. 146, 174 S.E.2d 331, 337 (1970).

---

maintaining underground distribution lines (that are scarce in the hills). The factor derived from comparing West Virginia overhead plant to company-wide overhead plant was 2.8123%, but the factor derived from comparing West Virginia underground plant to company-wide underground plant was only .1630%. Applying these factors to distribution *expense* resulted in the $73,000 difference between the Company figure and the Commission's figure that was based upon an over-all average distribution expense factor.

One cannot readily understand why the Company, if it is capable of breaking out distribution expenses into the various accounts such as overhead and underground expenses, cannot also break out those expenses on the basis of the jurisdiction where the work was done.

And, as the United States Supreme Court wrote in *Smith v. Illinois Bell Telephone Co.*, 282 U.S. 133 (1930) where it dealt with apportionment of telephone company expenses between interstate and intrastate service based upon the plant used in each type of service, "... While the difficulty in making an exact apportionment of the property is apparent, and extreme nicety is not required, only reasonable measures being essential (citations omitted) it is quite another matter to ignore altogether the actual uses to which the property is put." 282 U.S. at 150.

Our Commission did not "ignore altogether" any aspect of the expense claimed by the utility. It simply calculated the impact of the expense upon West Virginia rates differently than did the Company.

### B.

Vepco also contends that there is no factual or logical basis for the Commission's use of the ratio of West Virginia total plant to total system plant as the allocation factor by which to include in the West Virginia rate base, company-wide tax credits and tax deferrals. The company's detailed allocation of these accounts, whereby it traced tax beneficence to particular generating stations and transmission lines, and used its "factor" to assign to the West Virginia rate base a portion of the credits and deferrals, would have resulted in $77,112 less reduction from the West Virginia rate base than resulted from the method used by the Commission.[2]

Vepco contends that its allocation was precise and logical, but not used by the Commission apparently only for the reason that it showed a higher cost of West Virginia service. It cites *Anchor Coal Co. v. PSC*, 123 W. Va. 439, 15 S.E.2d 406 (1941) where this Court held that it would not interfere with the action of the Commission except under certain circumstances. The Court said at page 411:

---

[2] We found no explanation within the record to disclose to us the genesis of Factor 1, a Vepco allotment device that it claimed should be applicable to tax deferrals and audits.

"However, this does not exclude the right to correct a decision of the commission where it has failed to give consideration to evidence proper to be considered, and failure to consider such evidence may be classified as a mistake of law."

That case concerned the setting of railroad rates. We held that the Commission had erred in not considering evidence introduced by the petitioners about its cost of providing service.

Vepco also cites *United Fuel Gas Co. v. PSC*, 143 W. Va. 33, 99 S.E.2d 1 (1957), in which the Court reversed a decision of the Commission because it failed to consider the cost of gas supply and facilities located in other states that were used to supply service to West Virginia customers, in fixing West Virginia rates.

Our ruling on the point is that there is no showing by the company that there was disregard by the Commission of the tax credits and deferrals. Again, as in the other allocation question in this case, we recognize the imprecision of both methods and find no legal authority compelling us to interfere with the Commission choice.

## II.

Petitioner alleges that the Commission erred in determining the Company's federal tax liability. The Company made an adjustment of $97,000, rejected by the Commission, that Vepco contends resulted in understatement of Vepco's tax liability and thus overstatement of its net income. This tax deduction was for interest expense incurred by the company when it borrowed money to build new facilities. The facilities, which are not yet in use, are referred to in the briefs as "construction work in progress" or "CWIP."

The record reflects that interest expense related to West Virginia CWIP was $202,000 and that a $97,000 tax reduction resulted. The Company contends that the Commission is not only requiring the Company to carry the burden of building new facilities without any return

from the West Virginia ratepayers during construction, but is also reducing the amount of revenue the Company would collect if it were building no facilities at all, by reducing the rate base $97,000. Vepco argues that this result is arbitrary and capricious and that the Company's adjustment should be allowed. It maintains that during the construction period West Virginia ratepayers are paying nothing for the construction, and to give the benefit created by the tax credit to the ratepayer is to deprive the Company of a real asset ($97,000) without compensation.

The Commission argues that since Vepco saved $97,000 of federal income tax through credits for CWIP, the savings should be passed on to West Virginia customers, not to common stockholders as profit.

The Commission cites a prior case where it refused to consider any taxes other than those actually paid in the computation of the rate base. In Case No. 7613 (Cabot Corp.) the Commission stated:

> The Commission has a long-standing policy of not allowing as an expense item taxes other than those actually paid to the Federal Government. It has never allowed income tax recovery to be more or less than the actual tax paid. ... The Commission's basic philosophy is that the company cannot pass on to the rate payers the obligation of taxes that have not actually been paid to the Government.

The Commission basically justified its decision not to allow CWIP and incidental emoluments such as tax credits to affect the rate base, by its practice of allowing capitalization of interest. The Company is ultimately allowed to recover construction expense, including capitalized interest, after construction is completed and the project is put into service.

Of course, the fact is that the Commission merely allows no expenses to be included in rates that are not actually paid or payable by the Company.

It seems to us that there is no difference in the Commission's ruling on the point, than would be the case if the utility attempted to put into its rate base the cost of materials to repair lines, for example, at a catalogue price, where in fact the Company paid only half that price. It could not be argued that the utility's consumers should pay rates based upon an artificial price, not actually paid; and it likewise would seem reasonable that the customers should not pay rates based upon a tax expense not actually paid.

## III.

Vepco alleges that the Commission's failure to state a rate of return on common equity is error. The Commission approved an overall rate of return of 9.2% after Vepco's rate of return witness suggested a 9.93% overall rate of return and the Commission's witness recommended a 9.0% rate; but it did not specify a common equity rate of return.

The Company further contends that the Commission's reduction in rate base, expenses and overall rate of return results in return to equity of 9.3%, an amount so low that it would not satisfy the standards for rate of return set out in *United Fuel Gas Co. v. PSC*, 143 W. Va. at 45, 99 S.E.2d at 8 (the reasonable return standard) or in *Bluefield Water Works and Improvement Company v. PSC*, 262 U. S. 679 (1923), (the comparable earnings and capital tests).

However, the Company does not complain that the commission's action results in equity return so low as to violate the constitutional standards. It merely prays that a specific return on common equity be specified in the Commission's order.

In *Federal Power Commission v. Hope Natural Gas Co.*, 320 U. S. 591 (1944) the Court said:

> The return to the equity owner should be commensurate with return on investments and other enterprises having corresponding risks. That return, moreover, should be sufficient to insure

competence in the financial integrity of the enterprise so as to maintain its credit and to attract capital.

The Company contends that the Commission has failed to make this essential finding of fact. *Mountain Trucking Company v. PSC,* W. Va. (1975), 216 S.E.2d 566.

The contention would seem without merit. Vepco had no problem in calculating that the overall rate allowed by the Commission would produce a return on equity of 9.3%, if the company's position on allotment was adopted. Surely, the mathematics are the same to produce the equity return rate if the changes urged by the company are not made.[3] The return is implicit. The Commission's calculations reflect an imputed (and implicit) return on common equity of between 11.94% and 14.54% depending upon whether 1976 capital structure was used as a base for the calculation, or five-year averages of capital accounts.

We agree with the Commission that the rate of return to common equity will depend upon the Company's management, and within the overall rate of return there is

---

[3] Petitioner's brief seems inconsistent on the point:

"As rate base, expenses and rate of return increase, the amount of revenue to be produced by the new rates must increase; conversely, the amount of the rate increase would fall as these factors are reduced.

"In this case the Commission reduced each of these factors, in some instances to an extent not supported by the evidence, so that the resulting return is unreasonably low. If the corrections to expenses and rate base urged by the Company earlier in this brief are made ... the return on equity implicit (but not stated) in the Commission's final order would be approximately 9.3%. Such a return on equity investment is so low that it would not satisfy the "reasonable return" standard. . . .

[Later]:

". . . Earlier in this brief the Company has shown that the Commission understated expenses and rate base. ... When these errors are corrected and earnings are increased accordingly, the return on equity, though low, would not be so low as to fail clearly the constitutional test."

abundant latitude for profits for common stockholders to be made.

## IV.

Vepco's next assignment of error challenges the Commission's disallowance of a $64.00 flat charge the Company proposed to make for installation and removal of temporary service.

The only evidence supporting the requested charge was an exhibit that broadly stated that the cost of material and labor to install temporary service, plus 33.81% representing engineering, administration and contingencies, equaled $64.00. There was no supporting data about cost of material and labor, such as was provided in another exhibit about the regular service connection charge[4] and the Commission, having only a vaporous basis, at best, to judge the propriety of the charge, did not err in its refusal to allow it.

While it might have been a mistake for the Commission to disregard competent evidence about the cost of installation and removal of temporary service, it was not error for it to disregard the conclusory evidence presented by the Company upon the point (that, incidentally, seems to be contradicted by facts alleged in other exhibits relating to similar company service costs).

## V.

Vepco, finally, objects to the Commission's disallowance of the Company's practice of charging West Virginia customers higher rates in summer than in winter. The company has its highest consumption in the July-October period and must build its facilities to meet these peak demands; but in West Virginia its highest consumption is in the winter.

The Company alleges that it costs more to deliver electricity to West Virginia customers in summer than in

---

[4] Vepco Exhibit (REN-4) reflecting connection charges, specified labor costs for a connection to be $3.38, equipment $.38, material $.13, and processing cost $1.61.

winter; and it refers us to language in *United Fuel Gas Co. v. Public Service Commission, supra,* that decries Commission practices that appear to disregard company-wide operational integrity and instead "... create a fictitious, nonexistent plant whose facilities, contrary to the facts, end at state lines and which, as so fabricated, could not be operated practically, efficiently or economically. . . ." 143 W. Va. at 51, 99 S.E.2d at 12.

It seems reasonable to us that year-round economy and good resource management is promoted by year-round use of generating and distribution facilities as nearly as possible to capacity, thereby furthering a healthy system load balance. West Virginia customers' heavier winter use while Virginia and North Carolina customers are using less, help balance the yearly use. Therefore, although Vepco may be correct in its statement that it costs more to provide West Virginia's electricity in summer than in winter, it seems arguable that the proportionally heavier West Virginia use in winter, allowing fuller utilization of Vepco plant during the "off-months" elsewhere, may be advantageous to the entire system's economics.

## Conclusion

We believe it instructive to note that we have been cited to no case from any jurisdiction that either approves or disapproves any of the methods of allocation used by the Commission or Vepco, nor to any case that approves or disapproves either party's contentions about CWIP-inspired tax benefits, nor any that condemns a failure of the Commission to find the Company to be entitled to earn a specified amount or percent of overall rate of return, as return to common equity.[5] No authority appears that supports the conclusory-type evidence

---

[5] *Mountain Trucking Co. v. Public Service Commission,* 216 S.E. 2d 566 (W.Va. 1975), cited by Vepco, is not applicable. It dealt with a failure of the Commission to make a finding of fact. Here, the Commission found an overall rate of return that had implicit in it a range of rate of return to common equity whose actual amount depended upon management expertise.

the company introduced to substantiate its proposed $64.00 service charge for setting up temporary service, or that holds such evidence to require refutation. And no court was noted to have said that a commission was wrong in eliminating summer-winter differences in rates charged a utility's customers.

We are asked to find that the Commission's rulings on these points were wrong, arbitrary or capricious, or unsupported by evidence, with none except the authorities both sides rely on to the effect that we should interfere with the Commission when, but only when, it is clearly wrong; or that the utility is entitled to a fair return.

But we find no evidence that the utility is not making money, is not able to attract investors, or is not providing the service it should—elements which, if proved, might require us to reach a different result. *Federal Power Commission v. Hope Natural Gas Co.*, 320 U. S. 591 (1944).

*Affirmed.*

J.M.S.