301 S.E.2d 798

**The C & P TELEPHONE COMPANY OF W. VA.**

v.

**PUBLIC SERVICE COMMISSION OF W. VA.**

**No. 15661.**

Supreme Court of Appeals of West Virginia.

March 29, 1983.

David B. Frost, Charleston, for petitioner.

Joel B. Shifman, Daniel L. Frutchey and Marc E. Lewis, Legal Div., Public Service Com'n, Charleston, for respondent.

HARSHBARGER, Justice:

The Chesapeake and Potomac Telephone Company of West Virginia, Inc. appeals from a May 7, 1982 order of the Public Service Commission denying its requested rate increases for (1) salaries scheduled for C & P's lower level managers, (2) the cash working capital component of C & P's rate base, and (3) the inflation adjustment on Western Electric purchases.[1] C & P's original tariff sought a $75 million increase in rates and charges. It revised its request to $67.69 million dollars. This matter was heard before the Public Service Commission in February and March, 1982. On May 7, 1982, the Commission granted C & P an increase in annual revenues of $32,069,000.

Our standard of review in Public Service Commission cases was stated in

---

1. The Public Service Commission was asked to address thirty-one issues: rate of return, Western Electric, licenses contract, deferred federal income taxes, working capital allowance in rate base, construction work in progress (CWIP) in rate base, rate base deduction for customer deposits, station apparatus and inventory shortages, expensing of station connections, effective tax rate/consolidated taxes, inflation adjustment, separations, management salaries, advertising expense, directory revenue, rate case re- fund expense, community activity contributions and Pioneer activities, uncollectable expense, lobbying expenses, excused days' pay expense, Public Service Commission fees, capital recovery adjustments (whole life/remaining life depreciation rates), concession service, sale of exchanges, joint planning, after hours repair, repression, audit problems, miscellaneous issues, end results, and rate design.

C & P has appealed only three of the Commission's rulings.

Syllabus Point 2 of *Monongahela Power Company v. Public Service Commission*, 166 W.Va. 423, 276 S.E.2d 179 (1981):

In reviewing a Public Service Commission order, we will first determine whether the Commission's order, viewed in light of the relevant facts and of the Commission's broad regulatory duties, abused or exceeded its authority. We will examine the manner in which the Commission has employed the methods of regulation which it has itself selected, and must decide whether each of the order's essential elements is supported by substantial evidence. Finally, we will determine whether the order may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable. The court's responsibility is not to supplant the Commission's balance of these interests with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors.

▮ The burden of proof is on a public utility to show that its proposed increased rates or charges are just and reasonable. W.Va.Code, 24-2-4a; Syllabus Point 1, *Natural Gas Company v. Public Service Commission*, 95 W.Va. 557, 121 S.E. 716 (1924).

## I.

## SALARIES

C & P sought management wage level increases of $5,036,000 as going-level adjustments.[2] These increases would have been implemented over the years 1980, 1981 and 1982. In Case No. 80–182, C & P's prior rate filing, the Commission allowed management wage increases for 1980 and 1981 of $536,000 and $779,000, respectively. In this case, C & P requested management wage increases of $1,343,000 and $2,335,000, respectively for 1980 and 1981. The Commission approved an increase of 20.1 percent over the 1980 test year levels,[3] and granted a wage level increase of $3,808,000. The Commission's disallowance of $1,228,000, does not reduce the increase previously approved in Case No. 80–182, and the Commission found that it permitted C & P to meet other competitive salaries in the utility industries.

Finding of Fact No. 34 of the Commission's final order reads:

C & P needs to pay reasonable wage levels to its management level employees in order to retain and hire qualified managers, and compete on a nationwide basis for qualified employees....

In Conclusion of Law No. 15, the Commission decided:

While C & P is entitled to a reasonable level of management wages, it is unreasonable to approve an increase in those wages in excess of the inflation adjustment approved as reasonable for C & P by the Commission in this case given the current economic climate of this State.

In the text of the final order, the Commission explained its position more clearly:

The Commission is of the opinion that the C & P management levels which are

---

**2.** The basic approach to rate-making is to take a test year and determine revenues, expenses and investments for that year. Test year data is then adjusted for reasonably anticipated, known and measurable changes. These are called going-level adjustments.

Going-level adjustments are "used to annualize the effect of significant changes that occurred during the test year but which were not reflected for the full twelve month period, and to reflect the effect of known and measurable changes in revenue and expense levels following the end of the test year. Consideration of items treated differently for rate-making purposes than for bookkeeping purposes should also be reflected as going-level adjustments." Rules and Regulations for the Government of the Construction and Filing of Tariffs of Public Utilities and Common Carriers by Motor Vehicle, 1977, Directions for Statement A, p. 24.

**3.** The Commission prescribed inflation factor of 20.1 percent is not an annual figure, but reflects the impact of inflation over a twenty-seven month period. This figure was used throughout the final order.

included in this salary increase are entitled to higher levels than those approved by this Commission in Case No. 80–182–T–42T. Common sense indicates that for all citizens, the cost of living has increased and C & P's employees are not exempt from these increases. However, this Commission also recognizes that currently the State and the entire nation are undergoing a period of economic downturn, in which both union and management employees in companies across the nation are accepting either lower wage increases, no increases, or even wage reductions in return for continued employment. The Commission is of the opinion that C & P's proposed management salary increases should be approved only to the extent that they are not in excess of the inflation adjustment approved by the Commission previously in this order. Thus, we will adopt the Company adjustment up to the level of the inflation adjustment adopted previously in this order but will disallow those management salary increases, amounting to $1,228,000 which exceed the level of the inflation adjustment we have approved in this case. This decision reasonably reflects both the need of C & P employees for reasonable salaries and a recognition that in this current economic period, unlimited management salary increases may not be justified. We are mindful of C & P's arguments that its proposed salary levels are the minimum necessary to hire and retain qualified management; however, we are of the opinion given the occurrences set forth previously in this section (i.e. union and management employees across the nation accepting small or no wage increases, or even wage reductions), a management salary level increase up to 20.1 percent over the levels approved in Case No. 80–182–T–42T adequately meets C & P's need to pay competitive salaries.

■ The Public Service Commission has balanced the financial integrity of C & P with appropriate protection to the relevant public interests and we cannot say their conclusion is contrary to the evidence, arbitrary, or results from a misapplication of legal principles. *Virginia Electric and Power Company v. Public Service Commission,* 161 W.Va. 423, 242 S.E.2d 698 (1978).

## II.

### CASH WORKING CAPITAL

Traditionally, a cash working capital allowance is a component of C & P's rate base. This allowance permits the company to retain investor-supplied funds to pay its outstanding indebtedness between the time when service is rendered and payments are received from the customers. It is placed in the rate base so investors will get a fair return on their money.

The Public Service Commission may employ such methods for determining utility rates as it deems suitable, so long as the end result guarantees West Virginia consumers good service at fair rates and enables utilities to earn a competitive return for their stockholders upon their investment in West Virginia.

Syllabus, *Virginia Electric and Power Co. v. Public Service Commission,* 161 W.Va. 423, 242 S.E.2d 698 (1978).

The Public Service Commission, exercising powers granted it in W.Va.Code, 24–1–7, has established *Rules and Regulations for the Government of the Construction and Filing of Tariffs of Public Utilities and Common Carriers by Motor Vehicle.* Rule 19 explains procedure for proposed rate changes:

A public utility desiring to modify, change, cancel or annul any of its rates, fares, classifications, charges, or rules and regulations, may file with the Commission its application, together with seven (7) copies of the same, in the form prescribed by the Commission for that purpose. Such application shall set forth (1) the rates, charges, rules and regulations in effect, (2) the proposed rates, charges, rules and regulations, (3) if increase or reduction in rates estimated annual effect on revenue, and (4) the reason for the proposed change.... The

application shall be accompanied by the information prescribed by Rule 42.

Rule 42 states, in pertinent part:

THE INFORMATION REQUIRED BY THIS RULE REPRESENTS THE *MINI-MUM* DATA THAT MUST ACCOMPA-NY ALL TARIFF FILINGS, APPLICA-TIONS FOR AUTHORITY TO CHANGE RATES AND CHARGES OR APPLICA-TIONS FOR APPROVAL OF INITIAL RATES. IF A UTILITY FAILS TO COMPLY WITH THIS RULE THE TAR-IFF FILING OR APPLICATION SHALL NOT BE RECEIVED OR CON-SIDERED BY THE COMMISSION BUT SHALL BE RETURNED TO THE UTIL-ITY.

Each utility ... shall present the schedules and exhibits upon which it intends to rely in support of its application or filing. Such schedules and exhibits shall include, *but not necessarily be limited to*, the minimum requirements outlined in Statements A to G, inclusive.

.    .    .    .    .

The information required by this Rule shall be furnished as a minimum requirement. Other information shall be provided as deemed appropriate by the applicant or as requested by the Commission.

The Commission's Statement B, Schedule 7, explains:

This schedule provides detail of the calculations of a working cash allowance to be included in the average rate base. An allowance for working cash will generally be allowed equal to 45/365 times (12.33%) annual operation and mainte-nance expenses, excluding the cost of commodities purchased for resale (gas, electricity or water). While this rule will generally apply, certain exceptions may be applicable, including the following:
(1) Telephone companies *will be allowed* a working allowance equal to 15/365 times (4.11%) annual operation and main-tenance expenses.

Commission's *Rules and Regulations For The Government of the Construction and Filing of Tariffs*, Rule 42, Statement B, Schedule 7 (emphasis supplied).

Telephone companies were provided a different working cash allowance because telephone bills are generally paid in advance of service. The Commission first adopted its cash working capital formula in 1949, and has used this formula in every one of C & P's fifteen rate setting cases since then. Using the 4.11% annual expenses figure, C & P sought to include $7,334,210 in its rate base for a cash working capital allowance.

The Commission accepted the staff's argument that C & P did not require a working cash allowance because there were not excess investor-supplied funds which were not earning a fair return. The Commission reasoned:

While we recognize the Company's argument that it should be entitled to include the formula calculation for working cash in its rate base, we are of the opinion that Staff has more accurately stated the purpose of that formula than has the Company. As Staff has pointed out, the formula set forth in this Commission's Rule 42, represents only a filing requirement which is to serve as a starting point for the Staff audit and Commission investigation of the reasonableness of the Company's request. The burden is still upon the Company to demonstrate that it does in fact require a working cash allowance. The Company in this case has not rebutted the Staff showing that such an allowance is unnecessary.

■ We do not conclude that a disallowance of cash working capital is unreasonable. We do find, however, that C & P was reasonable in relying on Statement B, Schedule 7 of the Commission's filing Rule 42 in submitting a cash working capital figure equal to 4.11 percent of annual operation and maintenance expenses.

C & P was not informed of the Staff's challenge to its cash working capital allowance until almost seven months after the case was filed, and three weeks before hearings were to commence. It did not have sufficient time to complete a lead-lag study to determine the actual period between the time expenditures are made and

the time revenues are received from customers.

The United States Supreme Court recognized a due process deprivation in a Public Service Commission's change of an allocation method without timely notice to a company. The court stated in *West Ohio Gas Company v. Public Utilities Commission,* 294 U.S. 63, 70, 55 S.Ct. 316, 320, 79 L.Ed. 761 (1935):

> We do not now decide that there would be a denial of due process through the spread of distributing costs over the total area of service, if the new method of allocation had been adopted after timely notice to the company and then consistently applied. This court does not sit as a board of revision with power to review the action of administrative agencies upon grounds unrelated to the maintenance of constitutional immunities. *Los Angeles Gas & Electric Corp. v. Railroad Commission of California,* 289 U.S. 287 [53 S.Ct. 637, 77 L.Ed. 1180]. Our inquiry in rate cases coming here from the state courts is whether the action of the state officials in the totality of its consequences is consistent with the enjoyment by the regulated utility of a revenue something higher than the line of confiscation. If this level is attained, and attained with suitable opportunity through evidence and argument (*Southern Ry. Co. v. Virginia,* 290 U.S. 190 [54 S.Ct. 148, 78 L.Ed. 260]) to challenge the result, there is no denial of due process, though the proceeding is shot through with irregularity or error. But the weakness of the case for the appellee is that the fundamentals of a fair hearing were not conceded to the company. Opportunity did not exist to supplement or explain the annual reports as to the distribution of the expenses in the neighboring communities, nor did opportunity exist to bring the rates outside of Lima into harmony with the exigencies of a new method of allocation adopted without warning.

The United States Supreme Court was dealing with a change in allocation method; here we are referring to a change in a filing rule with less substantive implications, according to a majority of our court. Nonetheless, fairness requires administrative bodies to abide by their rules until they are lawfully changed by law. Syllabus Point 1, *State ex rel. Wilson v. Truby,* 167 W.Va. 179, 281 S.E.2d 231 (1981); Syllabus Point 1, *Trimboli v. Board of Education,* 163 W.Va. 1, 254 S.E.2d 561 (1979). *Accord, Vitarelli v. Seaton,* 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); *Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954); *Bridges v. Wixon,* 326 U.S. 135, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945); *Arizona Grocery Co. v. Atchison, Topeka and Santa Fe Ry.,* 284 U.S. 370, 52 S.Ct. 183, 76 L.Ed. 348 (1932). *See Gadsden State Bank v. Lewis,* 348 So. 343 (Fla. Dist.Ct.App.1977); *Central Louisiana Electric Co. v. Louisiana Public Service Commission,* La., 377 So.2d 1188 (1980); *Indiana Alcoholic Beverage Commission v. McShane,* 170 Ind.App. 586, 354 N.E.2d 259, 265, n. 1 (1976); *State ex rel. Independent School District No. 6 v. Johnson,* 242 Minn. 539, 65 N.W.2d 668 (1954); *Douglas County Welfare Admin. v. Parks,* 204 Neb. 570, 284 N.W.2d 10 (1979); *State ex rel. Meeks v. Gagnon,* 95 Wis.2d 115, 289 N.W.2d 357, 361 (1980); Note, Violations by Agencies of Their Own Regulations, 87 Harv.L.Rev. 629 (1974).

This is especially true when an individual or company "reasonably relied on agency regulations promulgated for his guidance or benefit and has suffered substantially because of their violation by the agency." *United States v. Caceres,* 440 U.S. 741, 752–753, 99 S.Ct. 1465, 1471–1472, 59 L.Ed.2d 733, 744 (1979); *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *Morton v. Ruiz,* 415 U.S. 199, 235, 94 S.Ct. 1055, 1074, 39 L.Ed.2d 270 (1974). *See also Panhandle Eastern Pipe Line Co. v. Federal Energy Regulatory Commission,* 198 U.S.App. D.C. 387, 613 F.2d 1120, 1135 (1979), *cert. den.,* 449 U.S. 889, 101 S.Ct. 247, 66 L.Ed.2d 115 (1980); *United States Lines, Inc. v. Federal Maritime Commission,* 189 U.S.App.D.C. 361, 584 F.2d 519, 526, n. 20 (1978); *Brown Express, Inc. v. United*

*States,* 607 F.2d 695 (5th Cir.1979); *Daughters of Miriam Center For the Aged v. Mathews,* 590 F.2d 1250 (3d Cir.1978); *Illinois Bell Telephone Company v. Allphin,* 50 Ill.Dec. 739, 95 Ill.App.3d 115, 419 N.E.2d 1188, 1196–1199 (1981); *People ex rel. Cinquino v. Board of Education,* 86 Ill.App.2d 298, 307, 230 N.E.2d 85 (1967).

■ Public utilities use these rules to plan their proofs in rate cases. And, of course, their rate cases found their survival. Utilities have no vested right to any particular approach, but they have a right to application of the current, effective rules to their rate filing, absent reasonable notice (here only three weeks) that another rule would be contended for by the Commission's staff. In *English Moving & Storage Co. v. Public Service Commission,* 143 W.Va. 146, 100 S.E.2d 407, 410 (1957), we reversed our public service commission for failing to follow and apply rules it had promulgated:

Its failure to apply those rules and its action in construing the language of the certificate and in placing upon it a construction which is not justified by the plain terms and provisions of the certificate and which is violative of its applicable rules constitute an error in law which requires reversal of the challenged orders.

■ When an administrative agency reverses course from its precedents, it must give reasonable notice and supporting rationale before it changes its standards, or its actions appear arbitrary and capricious. *Boston Edison Co. v. Federal Power Commission,* 181 U.S.App.D.C. 222, 557 F.2d 845, 848–849, *cert. denied,* 434 U.S. 956, 98 S.Ct. 482, 54 L.Ed.2d 314 (1977); *Trustees of Clark University v. Dept. of Public Utilities,* 372 Mass. 331, 361 N.E.2d 1285 (1977); *New England Telephone and Telegraph Co. v. Public Utilities Commission,* R.I., 446 A.2d 1376, 1389–1390 (1982); *Michaelson v. New England Telephone and Telegraph Co.,* R.I., 404 A.2d 799, 813 (1979).

In *Re Chesapeake and Potomac Telephone Company,* 43 PUR.4th 169 (1981), the District of Columbia Public Service Commission rejected the Office of People's Counsel's challenge to C & P's working capital study. It stated at p. 177:

We will accept the company's revenue lag days calculation. As indicated earlier, the methodology on which the company's study was based has been consistently approved by this commission in prior cases. See, e.g., *Re Potomac Electric Power Co.* (1980) 36 PUR4th 139; *Re Potomac Electric Power Co.* (1979) 29 PUR4th 517; *Re Washington Gas Light Co.* Formal Case No. 686, Order No. 6051 (1979). ...

In future cases, however, we wish to see the company develop its revenue lag figures by using at least a 12-month sample. Although we accepted a study based on a three-month sample in Formal Case No. 631, we now feel that a study based upon a larger data base would yield a more accurate picture of past experience, and, concomitantly, a better foundation for predicting the future.

The Commission should accept C & P's working cash capital allowance in this filing, and if it pursues this revision of its former posture, require C & P to conduct proper lead-lag studies before its next filing.

III.

ALLOWANCE OF INFLATION ADJUSTMENTS ON PURCHASES FROM WESTERN ELECTRIC

The Commission adopted an inflation adjustment of 20.1 percent for all expenses for which a going-level adjustment was not specifically made. C & P does not challenge the factor selected by the Commission. C & P argues that the Commission's decision to not apply the inflation adjustment to Western Electric purchases was intended to punish C & P, not a legitimate reason for eliminating this figure from the rate base. It claims the Commission's actions were arbitrary.

The Commission made the following findings of fact and conclusions of law with

respect to Western Electric's purchases: [4]

## FINDINGS OF FACT

9. C & P presented no evidence or testimony in this case on the issue of the reasonableness of the prices paid to Western Electric by C & P for Western Electric products which was substantially different, or presented this Commission with any further information, than it presented in Case No. 80–182–T–42T.

10. The Supreme Court of Appeals of West Virginia has upheld the reasonableness of this Commission's adjustment to C & P's rate base and depreciation expenses by an amount representative of Western Electric's excess profits (*The Chesapeake and Potomac Telephone Company of West Virginia v. The Public Service Commission of West Virginia*, Slip Opinion No. 15424, March 4, 1982).

11. C & P presented testimony which only compared Western Electric's prices on a weighted average total Bell System basis with the lowest price charged by the general trade suppliers for a given product, rather than presenting testimony comparing the price paid by C & P for Western Electric products with the lowest price charged by general trade suppliers for the same product (C & P Exh. 12).

12. Western Electric earned a rate of return on equity and investment for the year 1980 substantially in excess of the rate of return approved by this Commission for C & P (C & P Exh. 9, Exh. DJ, pg. 8).

13. In many instances, prices charged by Western Electric for its products are considerably higher than prices charged by general trade suppliers for similar products (Staff Exh. 9, pp. 16–18; Staff Exh. 9A).

14. C & P frequently uses Western Electric products even where an equivalent lower priced general trade product is available (Tr. Vol. 3, pp. 107, 109, 114–

115, 127–129, 134, 137, 140, 142, 145, 147 and 149).

15. Until an order is issued by the Supreme Court of Appeals of West Virginia on the petition for reconsideration filed by this Commission in *The Chesapeake and Potomac Telephone Company of West Virginia v. The Public Service Commission of West Virginia, supra*, the decision of the Court, with regard to the Commission's authority to make a Western Electric excess profits adjustment for surviving Western Electric products purchased from 1959 onward, is stayed and of no force and effect (*Atlantic Greyhound Corporation v. The Public Service Commission of West Virginia*, 132 W.Va. 650 [1949], at pages 664–665 [56 S.E.2d 169]; *Appalachian Power Company v. The Public Service Commission of West Virginia*, 162 W.Va. 839, 253 S.E.2d 377 [1979] at page 380).

. . . . .

31. The Company obstructed the efforts of Commission Staff to obtain accurate information which would reflect the actual inflationary trend of Western Electric prices (Staff Exh. 6, p. 8; Staff Exh. 7, p. 13; Staff Exh. 7B, pp. 1–3; C & P Exh. 9, p. 26; Tr. Vol. 6, pp. 121, 139–140).

. . . . .

57. The evidence indicates that C & P is frequently dilatory and at times obstructionistic with regard to providing Commission Staff with information needed to fully perform an acceptable Staff audit, which can lend assistance to the Commission during the trial of a rate case (see generally Staff Exhs. 6, 6A, 7, 7A and 10).

## CONCLUSIONS OF LAW

2. Since the Company provided this Commission with no new testimony or evidence on the issue of the reasonableness of Western Electric prices and did

---

4. *See generally,* Annot., Amount Paid By Public Utility to Affiliate for Goods or Services as Includible in Utility's Rate Base and Operating Expenses in Rate Proceeding, 16 A.L.R.4th 454 § 6–10 (1982).

not provide this Commission with the type of information which we specified in Case No. 80–182–T–42T as being necessary for a Commission decision favorable to the Company on this issue, we are of the opinion that our decision in Case No. 80–182–T–42T is reasonable and should be adopted in this case.

3. Until the Supreme Court of Appeals of West Virginia issues its order on the Petition for Reconsideration filed by this Commission in *The Chesapeake and Potomac Telephone Company of West Virginia v. Public Service Commission of West Virginia*, Slip Opinion No. 15424, the decision of the Court with regard to the inpermissibility [sic] of a portion of our Western Electric adjustment in the previous C & P rate case is stayed and of no force and effect.

.      .      .      .      .

31. The Company has been unreasonably dilatory and obstructionistic with regard to providing Commission Staff with information needed to fully perform the Staff audit in this case and, shall, in the next rate case, cooperate to the fullest extent with Commission Staff during performance of the audit, even beyond normally expected cooperation between a utility company regulated by this Commission and Commission Staff, considering the complexity and difficulty of an audit of C & P's books and records and the statutory time limit on the Commission for deciding rate cases.

These conclusions are further explained in the text of the final order:

Staff Adjustment No. 46 increases operating expenses by $7,500,000 to reflect the effects of inflation which will occur during the first full year in which these rates will be in effect. This adjustment parallels the Company's Adjustment No. 44, but excludes Western Electric purchase expenses, license contract fees, and utilizes a slightly different factor (C & P uses 21.1%, while Staff uses 20.1%). . . . While Staff stated that it had no objection to a reasonable provision for inflation for Western Electric purchases and license contract fees,

Staff did take the position that, for intercompany transactions, a specific measurement should be required before applying an inflation adjustment to those expenses. Staff took the position that better data is available within the accounting system for affiliated transactions, which is preferable to a broad based index such as the GNP implicit price deflator. Further, Staff was of the opinion that a company might attempt to simply roll all expenses into the Staff inflation adjustment, without making an effort to specify the actual effects upon inflation of specific adjustments. ...

The Company also advocated that the Commission include Western Electric purchases by C & P in the inflation adjustment. . . .

Commission Staff attempted on several occasions, as detailed in the record, to obtain price information with regard to Western Electric purchases which would give an indication as to the actual Western Electric price increases. Such information was never provided to Commission Staff; however, during the hearings in this case, Company witness Jones testified that prices for Western Electric products were rising at a rate of approximately 16% as of November of 1981 (Tr. Vol. 6, pp. 121 and 139–140). Given that the Company obviously had this information and utilized it in preparing its testimony on Western Electric, this Commission is of the opinion that at least in this instance, the Company deliberately withheld available information from Commission Staff. Therefore, while we would normally have approved an inflation factor adjustment for Western Electric purchases, we will totally exclude Western Electric products from any inflation adjustment in this case as a result of the Company's lack of cooperation with Commission Staff with regard to obtaining information on price trends of Western Electric products. (Citations omitted.)

■ Again, we start from the premise that the utility has the burden of proving the reasonableness of any increase it requests. *Accord, Utah Department of*

*Business Regulation, Division of Public Utilities v. Public Service Corporation,* Utah, 614 P.2d 1242, 1245 (1980); *Public Service Coordinated Transport v. State,* 5 N.J. 196, 74 A.2d 580, 593–594 (1950); *Bell Telephone Co. of Pennsylvania v. Pennsylvania Public Utility Commission,* 47 Pa.Commw. 614, 408 A.2d 917, 925–926 (1979); *Texas Alarm and Signal Association v. Public Utility Commission,* Tex., 603 S.W.2d 766 (1980); *Re Southern California Gas Company,* 35 PUR.3d 300, 309 (1960); *Re Gas Company of New Mexico,* 28 PUR.4th 20, 23 (1978). The Commission has a duty to go beyond the Company's schedules and submissions. *Public Service Coordinated Transport v. State, supra* 74 A.2d, at 591–592; *Utah Department of Business Regulation, supra* 614 P.2d, at 1247.

■■■ The Commission Staff requested additional submissions from C & P on Western Electric purchases. Utilities must supply information requested by the Commission, W.Va.Code, 24–2–7 and 24–2–9, and it need not be in the form of the company's account books. *Accord, Washington Public Interest Organization v. Public Service Commission,* 393 A.2d 71, 80–82 (D.C.App.1978), *U.S. cert. denied; New England Telephone and Telegraph Co. v. Public Utilities Commission,* Me., 390 A.2d 8, 23 (1978); *Trustees of Clark University v. Department of Public Utilities,* 372 Mass. 331, 361 N.E.2d 1285 (1977); *American Can Co. v. Davis,* 28 Or.App. 207, 559 P.2d 898 (1977); *New England Telephone and Telegraph Co. v. Public Utilities Commission,* R.I., 446 A.2d 1376, 1385 (1982). The Staff needed that data to determine the appropriate inflation adjustment, rather than to apply an across-the-board inflation factor. These requests for data were made in ample time for C & P to respond.

■■■ The Commission had requested this data in three previous orders. *Re Chesapeake and Potomac Telephone Company of West Virginia,* 26 PUR.4th 29, 38 (1978), 40 PUR.4th 279 (1980), and 42 PUR.4th 312 (1981). The large quantity of business done with Western Electric, which

resulted in $10,745,560 in C & P's operating expenses, recommends that it be treated differently than minor purchases. Although there was some evidence that purchases of manufactured goods from Western were not increasing at a rate commensurate with the general inflation rate, the Staff could not obtain sufficient data from C & P to quantify the exact level of past and prospective changes in prices for Western Electric products.

Other courts and public service commissions have addressed the problem of a utility company's failure to submit required data. The Texas Supreme Court, in *Texas Alarm and Signal Association v. Public Utility Commission, supra* 603 S.W.2d, at 773, wrote:

> We have previously recognized Bell's size and how it creates an "aura of self-evaluation" in Commission proceedings. *State v. Southwestern Bell Telephone Co.,* 526 S.W.2d 526, 532 (Tex.1975). We also recognize that Bell has the data and expertise required to design rate structures. Therefore, to justify their [sic] rate structure, Bell must present its data and produce additional information that is reasonably requested by the Commission or intervenors. In summary, the Commission has discretion to determine relevant factors in a rate design problem; those factors must address whether the resulting rate structure is just, reasonable, and not unreasonably discriminatory; the utility must be consistent in proceedings; and the burden of proof of the utility includes the obligation to produce relevant information.

This same concept was articulated by the Utah Supreme Court:

> A state regulatory commission, whose powers have been invoked to fix a reasonable rate, is entitled to know and before it can act advisedly must be informed of all relevant facts. Otherwise, the hands of the regulatory body could be tied in such fashion it could not effectively determine whether a proposed rate was justified.
>
> *Utah Department of Business Regulation v. Public Service Commission, supra* 614 P.2d, at 1245–1246 (footnotes omitted).

The Maine Supreme Court supported its Public Utilities Commission's decision to deny New England Telephone and Telegraph Co. (NET) a short-term CWIP (construction work in progress) expense in its rate base with an appropriate AFUDC (allowance for funds used during construction) adjustment. The court stated:

NET contends alternatively that the Commission should have included NET's short-term CWIP in rate base with an appropriate AFUDC adjustment instead of merely excluding all short-term CWIP. The Commission does not deny that an AFUDC adjustment would have been acceptable but claims that NET failed to present any evidence to support a computation of the adjustment. ...

It does not appear why the necessary information could not have been extracted and compiled with a reasonable amount of effort and within a reasonable period of time. ...

Accordingly we hold that the Commission's exclusion of $4,877,000 of short-term CWIP from rate base without an AFUDC adjustment in NET's income statement was reasonable as long as NET did not supply the data necessary for computing the compensating AFUDC offset.

*New England Telephone & Telegraph Co. v. Public Utilities Commission*, Me., 448 A.2d 272, 294–295 (1982).

Rhode Island's Public Utilities Commission refused to excuse NET's failure to provide requested cost studies and rejected the cost evidence submitted by the company. The Rhode Island Supreme Court upheld the Commission on this point:

In the case at bar, no finding was made concerning the additional aggregate revenue needs of NET. Indeed, the very heart of the controversy revolves around the commission's position that a threshold requirement for any determination of NET's increased revenue needs is the presentation of a comprehensive fully allocated cost study identifying "all costs associated with each and every particular service" listed in the company's tariff. Nor can it be seriously maintained that the record before us is devoid of any

complaints by the commission regarding NET's failure to provide it with more adequate and detailed cost information to support both the filing in question and previous filings. ... [W]e again stress that our statutory scheme places upon a Rhode Island utility the burden of proving both its overall revenue needs and the reasonableness of its rates. Moreover, no affirmative duty is imposed upon the commission to fix such rates when the utility has not demonstrated that its new rate schedule is reasonable and not unjustly discriminatory.

*New England Telephone & Telegraph Company v. Public Utilities Commission*, R.I., 446 A.2d 1376, 1386 (1982).

The New Mexico Public Service Commission stated in *Re: Gas Company of New Mexico, supra* 28 PUR.4th, at 23:

[A] utility has the burden of proof to demonstrate that its proposed increase in rates or charges is just and reasonable. The mere filing of schedules and testimony in support of the rate increase is insufficient to meet this burden. The company must support its application by way of substantial evidence.

Two other public service commissions have denied increases where access to necessary information has been denied the commission staff. In *Re: Southwestern Bell Telephone Company, supra* 36 PUR. 4th, at 290, the Missouri Commission denied the telephone company a portion of the license contract payment relating to antitrust litigation, stating: "[T]he portion of the contract payment relating to antitrust litigation should be disallowed since no expense should be included when the commission staff has been denied access to the supporting records to determine the proper level or the reasonableness of the claimed expense."

The Ohio Commission rejected an allowance for Ohio Edison's stockpile management program, an exercise mandated by EPA requirements, because the company's testimony was not backed by any evidence.

Applicant's witness Wilson estimates the handling costs associated with these efforts at $1,503,000 and proposes a two-year amortization of this amount.

Although it is apparent that the Company has been aware of these requirements for sometime, certainly since before the six-and-six case was submitted, no mention was made of the proposed adjustment in any of the applicant's previous filings. The staff had no opportunity to review the adjustment during its investigation, and we still have only vague clues as to the basis on which it is calculated. Under these circumstances, there is simply no way the Commission will approve such an adjustment.

*Re: Ohio Edison Company, supra,* 33 PUR.4th, at 466–467.

The Commission cannot punish C & P for its recalcitrance in providing requested and necessary information by denying an item. It should revise that portion of its final order that indicates its decision not to apply the inflation factor to Western Electric purchases was punitive. The Commission is provided other means of countermanding noncooperation. W.Va.Code, 24–2–2, 24–4–3.[5] Nonetheless, this portion of the Commission's decision is affirmed, based on C & P's total failure to prove by competent evidence that a 20.1 percent inflation factor was appropriately applied to its substantial purchases from Western Electric.

Affirmed in part; reversed in part.

---

**5.** We found its contempt power in W.Va.Code, 24–4–5 unconstitutionally violative of separation of powers. *Appalachian Power Co. v. Public Service Commission,* 170 W.Va. 757, 296 S.E.2d 887 (1982).