**PRESSLEY RIDGE SCHOOLS, INC., Plaintiff,**

v.

**Ann M. STOTTLEMYER, Commissioner, West Virginia Bureau for Medical Services, et al., Defendants.**

Civil Action No. 2:95–0970.

United States District Court, S.D. West Virginia, Charleston Division.

Dec. 9, 1996.

R. Clarke Vandervort, David R. Bungard, Charles M. Johnson, Robinson & McElwee, Charleston, WA, for plaintiff.

Darrell V. McGraw, Jr., Attorney General, State of W.V. Stephen J. Small and Charlene A. Vaughan, Office of Attorney General, Charleston, WA, for defendants.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

### I. FINDINGS OF FACT

1. Pressley Ridge Schools, Inc. (hereinafter "Pressley Ridge") is a nonprofit, Pennsylvania corporation whose principal place of business is Pittsburgh, Pennsylvania.

2. Pressley Ridge is a licensed behavioral health care provider operating residential facilities and programs that treat approximately 385 emotionally and behaviorally disturbed children in West Virginia.

3. Pressley Ridge relies almost exclusively upon Medicaid funding in providing services to emotionally and behaviorally disturbed children.

4. The West Virginia Department of Health and Human Resources (hereinafter "DHHR") is the executive branch department of the State of West Virginia responsible for overseeing the Bureau for Medical Services (hereinafter "the Bureau"). W.Va. Code §§ 5F–2–1 and –2. Defendant Gretchen O. Lewis is Secretary of DHHR.

5. The Bureau for Medical Services is a state agency responsible for implementing, overseeing and regulating the federal Medicaid program in West Virginia pursuant to Titles XIX, IV and XVI of the Social Security Act 42 U.S.C. §§ 1396, 601, and 1381. Defendant Ann Stottlemyer, Commissioner of the Bureau, reports to the Secretary of DHHR.

6. The Health Care Finance Administration (hereinafter "HCFA") of the United States Department of Health and Human Services oversees the Bureau's participation in the Medicaid program. 42 C.F.R. §§ 430.30(a), (b). HCFA provides approximately 72 percent of West Virginia's Medicaid program funding. HCFA can refuse to reimburse a state for Medicaid services if the state fails to operate its Medicaid program according to federal guidelines.

7. The Bureau entered into a Letter of Agreement with Pressley Ridge dated July 14, 1995, authorizing Pressley Ridge to participate as a Medicaid provider in the state Medicaid program. *See* trial notebook ex. 1. As a Medicaid participant, Pressley Ridge was eligible to receive reimbursement by the Bureau for behavioral health services rendered to Medicaid-eligible clients.

8. Pursuant to this Letter of Agreement, Pressley Ridge agreed to "make all records and documents available upon request to DHHR," and to "participate in evaluations and audits authorized by [DHHR], the Comptroller General of the United States, or their duly authorized representatives relative to evaluation of the quality, appropriateness, and timeliness of services pursuant to this Agreement." Trial notebook ex. 1 at 2.

9. One of the conditions stated in the governing Letter of Agreement required Pressley Ridge to assure that its "[s]ervices and programs comply with State Medicaid regulations described in all Medicaid manuals for which [Pressley Ridge] is certified." *Id.* at 2.

10. Also as part of this Agreement, DHHR agreed to:

Provide an appeal process which enables [Pressley Ridge] the opportunity to appeal decisions to the DHHR related to Medicaid issues through the Appeal Procedure

as outlined in Chapter 700 of all Medicaid manuals.

Respond to all questions of interpretation, quality, performance, or other matters related to the implementation of this Agreement. . . .

In general, all activity related to in this Agreement shall be pursuant to standards and procedures set forth in the DHHR Medicaid Services manuals. Official amendments or additions to said Medicaid Service manuals as may be made from time to time by the DHHR will be supplied to the provider in the form of program instructions.

*Id.* at 4.

11. The Bureau issues Medicaid Provider Manuals to all providers who agree to participate in the Medicaid program.

12. Chapter 500 of the Medicaid Provider Manual describes the behavioral health services reimbursable by Medicaid and establishes the documentation providers must maintain in order to receive Medicaid reimbursement for those services. *See* trial notebook ex. 2.

13. Each billable Medicaid service is assigned a billing code, and each billing code has a corresponding rate of payment. The two Behavioral Management Services and corresponding billing codes at issue are Behavioral Management Implementation (W0355) and Behavior Management Plan Development (W0356).

14. Section 540 of the Medicaid Provider Manual in effect during the period of dispute defines Behavioral Management Services as "specific activities which have been planned and tailored to eliminate inappropriate (maladaptive) behaviors and/or to increase or develop desired adaptive behaviors for an individual client. These services result from areas of need identified on the individual's treatment plan." Trial notebook ex. 2 at 13. Section 540 further notes that Behavioral Management Services are "time limited services which should end when the desired outcomes have been achieved (i.e., targeted behaviors have been acquired or eliminated)." *Id.* If those outcomes are not achieved "within specified time frames, then

the behavior management plan must be reviewed and subsequently terminated." *Id.* at 13–14.

15. Section 541 of the Medicaid Provider Manual concerns Behavior Management Plan Development, billing code W0356. Section 541 sets forth the forms of documentation providers must retain in order to justify these services so that they may receive reimbursement for those services from the Bureau.

16. Section 541 provides that in order to receive Medicaid reimbursement for Behavior Management Plan Development, a provider must have a "completed Behavior Management Plan." *Id.* at 15. This plan "at a minimum shall include: 1) baseline data (i.e., *measured amounts or levels of behavior recorded prior to any intervention* ) . . . ." *Id.* at 15 (emphasis supplied).

17. Baseline data is used to provide a starting point to enable Behavioral Management Services providers to gauge progress in eliminating or reducing a client's inappropriate or maladaptive behaviors or fostering the development of a client's appropriate behaviors.

18. Given the use of the word "or" to distinguish between the two forms of documentation, § 541 authorizes a Medicaid provider like Pressley Ridge to submit two alternative forms of documentation to the Bureau in support of its request for reimbursement for Behavior Management Plan Development services.

19. The first form of documentation permitted under § 541, that of "measured amounts . . . of behavior," is quantitative in nature. Behavioral Management Services providers can quantify certain targeted behaviors by noting the frequency and duration of those behaviors.

20. The second form of documentation permitted under § 541, that of "levels of behavior," is qualitative or descriptive in nature. Behavioral Management Services providers can describe certain targeted behaviors by noting, for example, the level of intensity of those behaviors.

21. Behavior Management Plan Development is one of the most expensive behavioral

health billing codes. On or about June 1994, Pressley Ridge made a management decision to focus more on Behavior Management Plan Development rather than case management and other lower paying billing codes. As a result, the number of Pressley Ridge clients receiving Behavior Management Plan Development services more than doubled between the second quarter of 1994 and the second quarter of 1995. In addition, Pressley Ridge's Behavior Management Plan Development units per client increased by 500% over this same period. The end result was a tenfold increase in Behavior Management Plan Development services billings to the Bureau by Pressley Ridge, or from $63,875.00 in the second quarter of 1994, to $664,264.00 in the second quarter of 1995. The latter amount represented 58% of the total Behavior Management Plan Development services billings submitted by all providers to the Bureau during this period. Approximately 60% of Pressley Ridge's Medicaid reimbursement comes from services rendered in the areas of Behavior Management Plan Development and Behavioral Management Implementation.

22. This substantial increase in Behavioral Management Services billings came to the attention of HCFA, the federal oversight agency for the Medicaid program. HCFA official Jake Hubik reviewed Pressley Ridge's billing and participated in an on-site review at one of Pressley Ridge's facilities on August 9, 1995. As a result of this review and visit, HCFA advised the Bureau on September 12, 1995, that it was deferring payment of $495,541.00 to the Bureau related to Pressley Ridge's Behavioral Management Services billings.

23. In July 1995, the Bureau developed the Surveillance and Utilization Review of Services unit (hereinafter "SUR unit"), as required by 42 C.F.R. § 456.3, to monitor and review Medicaid providers' utilization of Medicaid services and to control inappropriate billing practices.

24. On August 29, 1995, the Bureau notified Pressley Ridge by letter advising it that, as a consequence of the August 9, 1995 visit by HCFA and conversations with Pressley Ridge staff, the Bureau was suspending all payments to Pressley Ridge and instituting a SUR review of its claims for Behavior Management Plan Development and Behavioral Management Implementation services for the period from January 1, 1995 through June 30, 1995.

25. By letter of September 15, 1995, the Bureau rescinded its decision to suspend all payments to Pressley Ridge, and the total suspension was never instituted. Def. supp. ex. 1.

26. Also in this letter, the Bureau advised Pressley Ridge it would "limit the suspension of payments to billing codes W0355 and W0356 only.... No electronic or HCFA 1500 submissions for these codes will be accepted from Pressley Ridge until further notice. Pressley Ridge may resume submission of claims for other services." *Id.*

27. On August 31, 1995, the Bureau held a training session for the thirteen members of the SUR unit. The unit was composed of employees from various departments of DHHR, some of whom were previously unfamiliar with Behavioral Management Services and the Medicaid Provider Manual. At the training session, these persons were provided with the relevant portions of the Manual, including § 541, for use in determining the adequacy of Pressley Ridge's Behavior Management Plans. At no time were the SUR unit members instructed that only quantitative data could satisfy the Manual's baseline data requirement for Behavior Management Plans.

28. The SUR review of Pressley Ridge's Behavioral Management Services claims was conducted between the period September 5–20, 1995. This was the first review conducted by the SUR unit.

29. During the first week of the review, the SUR unit approved for reimbursement approximately 88 percent of Pressley Ridge's Behavioral Management Services claims. After obtaining these results, the Bureau suspended the review on September 8, 1995 and summoned the SUR unit back to Charleston for additional training on September 14, 1995.

30. Dr. Robert Hess, Director of the Office of Behavioral Health Services ("OBHS").

of DHHR, and Ms. Helen Snyder conducted this second training session. At this session, Dr. Hess instructed the SUR unit that the Medicaid Provider Manual § 541 requirement of baseline data could be satisfied only by quantified data.

31. Sometime between September 12–18, 1995, Dr. Hess prepared a decision flowchart reflecting the quantified baseline data requirement. *See* trial notebook ex. 4. Dr. Hess gave the flowchart to the SUR unit on September 18, 1995. The stated purpose of the flowchart was to aid the SUR unit in its review of Pressley Ridge's records. Hess instructed SUR unit members that they were to use the flowchart to determine the adequacy of Pressley Ridge's Behavior Management Plans.

32. At this September 18 training session, SUR unit member Ruth Ware noted, "Concern that manual does not specify that baseline data must be quantitative," and "manual very flexible—review [of Pressley Ridge] very strict." Trial notebook ex. 10 at 3.

33. On September 18, 1995, SUR unit members were instructed to review again previously approved Behavior Management Plans and to disallow those plans upon reaching the first "No" in Dr. Hess' flowchart. Unit members also were told to disregard baseline data referenced in the client's treatment chart but not contained in the plan itself. The SUR unit's application of the flowchart criteria to Pressley Ridge's Behavior Management Plans resulted in the disallowance of over 90 percent of Pressley Ridge's Behavior Management Plans.

34. The Bureau's utilization of Dr. Hess' flowchart was inconsistent with the Bureau's announced public position. At public meetings held on September 12, 1995 and November 8, 1995, the Bureau continued to represent to Medicaid providers that, consistent with the Medicaid Provider Manual, both quantified ("measured amounts ... of behavior") and qualitative/descriptive ("levels of behavior") baseline data could be submitted in Behavior Management Plans. *See* trial notebook ex. 5.

35. The flowchart departed from the requirements of the Medicaid Provider Manual.

Whereas the Manual in § 541 provided baseline data could take either quantified form ("measured amounts ... of behavior") or qualitative/descriptive form ("levels of behavior"), the flowchart mandated only quantified baseline data could satisfy the baseline data requirement for Behavior Management Plan Development services. Specifically, the flowchart directed SUR unit members to inquire whether the Behavior Management Plan "[c]ontains Quantified Data on Specific Behaviors to be Changed that [have] been Collected prior to Intervention[.]" Trial notebook ex. 4.

36. The flowchart retroactively narrowed the definition of baseline data contained in § 541 of the Medicaid Provider Manual and also employed terms not found in the Manual's definition.

37. The Bureau first provided Pressley Ridge the flowchart on September 18, 1995. It had never been circulated to other providers, nor was it promulgated by the Bureau as an official amendment or program instruction altering the specific requirements of § 541 of the January 14, 1995 Manual. To date the Bureau has not filed the flowchart in the State Register.

38. After receiving the results of the SUR unit's review, the Bureau by letter of October 19, 1995, notified Pressley Ridge it would "begin pending all Pressley Ridge claims for prepayment review in order to evaluate the medical necessity and appropriateness of the services for which claims are submitted to the Medicaid program." Def. supp. ex. 2.

39. One day after the initiation of this litigation, the Bureau advised Pressley Ridge, by letter of October 27, 1995, in apparent contradiction to its October 19 letter, that it was not suspending payment to Pressley Ridge for *all* services; rather, it was suspending payment, via the prepayment review process, only for Behavior Management Plan Development and Behavioral Management Implementation services. Trial notebook ex. 11 at 1–2. Prepayment review, authorized by 42 C.F.R. 447.45(f), permits the Bureau to examine Pressley Ridge's Behavior Management Plans prior to authoriz-

**936**

ing any reimbursement from the Medicaid program.

40. On numerous occasions since the implementation of prepayment review, Pressley Ridge requested the Bureau to clarify its criteria for baseline data. Pressley Ridge also requested administrative review of the Bureau's decision to subject its claims for reimbursement to prepayment review. These requests were set forth in correspondence prepared by Pressley Ridge's counsel and sent to the Bureau on November 2, 1995, November 22, 1995, December 8, 1995, January 4, 1996 and February 2, 1996.

41. By letter of March 11, 1996, the Bureau denied Pressley Ridge's requests for administrative review of the prepayment review process, stating the decision to subject claims to prepayment review is a "utilization function[,] not an adverse action activating the administrative appeal procedures." Trial notebook ex. 3. The Bureau advanced no authority for this proposition.

42. On November 30, 1995, the Commissioner for the Bureau for Community Support and the Bureau for Children and Families, agencies of DHHR, wrote Pressley Ridge to advise that it had been identified as an "outlier." Def.'s supp. ex. 5. The letter explained an outlier is a provider whose "pattern of usage of a [Medicaid] service is significantly higher, on a per client basis, than the average of all behavioral health providers." *Id.* Accompanying analysis showed that for the month of June, 1995 the average Behavioral Management Services per client provided by Pressley Ridge was billed at 224 percent of the average cost per client per month of all Behavioral Management Services Providers in the state of West Virginia. The letter offered technical assistance to Pressley Ridge in its review of billing practices.

43. Bureau representatives met with Pressley Ridge on November 13, 1995 in an attempt to provide technical assistance on how Pressley Ridge might justify its Behavioral Management Services claims during the prepayment review period.

44. Pressley Ridge submitted its November, 1995 Behavioral Management Services claims on February 13, 1996. Behavioral Management Services claims for the month of December, 1995 were tendered in March, 1996 and Behavioral Management Services claims for the period January through April 1996 were tendered in July, 1996.

45. By letter of March 12, 1996 the Bureau notified Pressley Ridge it was denying 241 of Pressley Ridge's 253 November 1995 Behavioral Management Services claims because they contained "no quantified baseline data." Trial notebook ex. 6. The letter also stated the remaining twelve claims "are being pended with a request for additional information.... In order to complete the reviews [of these remaining claims], Pressley Ridge must specify what information they used as baseline data. Please refer to Section 540–541 of the ... Manual for clarification if needed." *Id.* at 1.

46. On April 10, 1996 Pressley Ridge requested administrative review by the Bureau of this decision. Trial notebook ex. 16. The Bureau granted this request almost three months later, on July 3, 1996. Trial notebook ex. 17.

47. By a letter dated May 29, 1996, the Bureau notified Pressley Ridge that, because its Behavior Management Plans contained no quantified baseline data, the Bureau denied 100 percent of Pressley Ridge's Behavioral Management Services provided in December, 1995. The billings for these services totaled $170,165.70. This letter also advised the Bureau denied the twelve plans it earlier pended in its letter of March 12. Again, the Bureau cited lack of quantified baseline data in Behavior Management Plans as the reason for its denial. Def.'s supp. ex. 6.

48. The May 29 letter further stated, "The Bureau must also require that the additional documentation specified in the manual be supplied to support [Pressley Ridge's] claims. That is, the *second type of documentation* [quantified baseline data] noted in the ... Manual, Chapter 500, Section 541, page 15, for billings under Behavior Management Plans, should be sent to document a claim for W0356 when no new plan results from the activity." *Id.* (emphasis added). The foregoing statement is an implicit admission by the Bureau that Medicaid providers could utilize two alternative forms of baseline data, quan-

tified ("measured amounts . . . of behavior") or qualitative/descriptive ("levels of behavior"), in support of claims for reimbursement for W0356 services. In the face of this admission, the Bureau's contention that the Medicaid Provider Manual required only one form of baseline data—quantified baseline data—is disingenuous.

49. On June 17, 1996, the Bureau conducted an administrative hearing on Pressley Ridge's appeal of the final report's findings. The resulting decision largely affirmed the conclusions of the report, including the disallowance of Pressley Ridge's Behavior Management Plan Development claims based upon lack of quantitative baseline data.

50. By letter of June 20, 1996 Pressley Ridge requested an administrative hearing appealing those denials. *See* trial notebook ex. 21. This hearing was originally scheduled for July 26, 1996, but was later postponed until August 9, 1996 at Pressley Ridge's request. The Bureau issued an administrative review decision on September 9, 1996, disallowing certain Behavior Management Plans submitted by Pressley Ridge due to lack of quantified baseline data. *See* trial notebook ex. 22.

51. Pressley Ridge also has submitted completed Behavior Management Plans for the months of January through August 1996. The Bureau has not informed Pressley Ridge whether it will reimburse the services represented by the plans.

52. In April, 1996 Pressley Ridge submitted a pilot plan to the Bureau to obtain elaboration from the Bureau why it was denying Pressley Ridge's plans. The Bureau did not respond to Pressley Ridge's request for assistance and information.

53. On July 22, 1996 the Bureau met with Pressley Ridge to provide technical assistance regarding how Pressley Ridge could substantiate and document Behavioral Management Services during the prepayment review period. The Bureau agreed to allow Pressley Ridge to supplement its documentation for a sample of plans submitted in November and December, 1995 considering the technical assistance it received at the meeting. These sample plans were discussed at the August 9, 1996 administrative review hearing and were the subject of the September 9, 1996 administrative review decision.

54. On July 8, 1996 a hearing was conducted by this Court, which issued a preliminary injunction in favor of Pressley Ridge, ordering, *inter alia*, the Bureau to pay Pressley Ridge the sum of $1,200,000.00 toward services previously claimed pending the outcome of the case and subject to the provision by Pressley Ridge of a bond in the amount of $1,200,000.00.

55. Although Pressley Ridge is a Pennsylvania corporation, its West Virginia operations receive no financial assistance from the corporate headquarters in Pittsburgh for running the day-to-day business operations in this state. As such, the profitability of Pressley Ridge's West Virginia existing seven offices is determined by the income generated from services rendered to West Virginia, and not from claims submitted to surrounding states.

56. As a direct result of the Bureau's withholding of Medicaid reimbursement, Pressley Ridge has laid off ten employees in West Virginia. Pressley Ridge also has suspended its business operations in Williamson, West Virginia and at the Family Development Center in Clarksburg, West Virginia.

57. As of October 1, 1996, the Bureau's implementation of prepayment review has resulted in the withholding of $2,536,042 in pending claims for Behavioral Management Services rendered by Pressley Ridge since November 1, 1995. The Bureau since has paid approximately $1,200,000.00 toward the resolution of pending claims as previously required by the preliminary injunction order.

58. As of October 1, 1996, Pressley Ridge has incurred $141,084.88 in legal expenses, including expert witness fees, in pursuit of this litigation. Since November 1, 1995 the Bureau's withholding of payments has caused Pressley Ridge to obtain extension of its credit line on two occasions and to incur interest expenses of $114,940.68. Pressley Ridge spent $12,000 to post the bond required by the Court.

## II. CONCLUSIONS OF LAW

1. Title 42 U.S.C. § 1983 establishes a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. That statute serves to remedy violations of federal statutes as well as the Constitution. *Maine v. Thiboutot,* 448 U.S. 1, 4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555 (1980).

2. To remedy ongoing violations of federal law, § 1983 permits an individual to obtain injunctive relief under *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). *Seminole Tribe of Florida v. Florida,* — U.S. —, — n. 16, 116 S.Ct. 1114, 1131 n. 16, 134 L.Ed.2d 252 (1996).

3. "Medicaid is a cooperative federal-state program through which the Federal Government provides financial assistance to States so that they may furnish medical care to needy individuals. [42 U.S.C.] § 1396. Although participation in the program is voluntary, participating States must comply with certain requirements imposed by the Act and regulations promulgated by the Secretary of Health and Human Services...." *Wilder v. Virginia Hosp. Assn.,* 496 U.S. 498, 502, 110 S.Ct. 2510, 2513–14, 110 L.Ed.2d 455 (1990); 42 U.S.C. § 1396.

4. Section 1983 protects the statutory right to reasonable reimbursement through the Medicaid program to providers of health care services, despite the availability of state administrative review procedures. *Wilder,* 496 U.S. at 520–23, 110 S.Ct. at 2523–25.

5. A statutory grant of rulemaking authority to an administrative agency does not confer the power upon the agency to enact retroactive rules unless that power is conveyed in specific terms. *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988).

6. The Bureau for Medical Services has no statutory authority to enact retroactive rules to determine the adequacy of baseline data submitted in Behavior Management Plans.

7. "[F]airness requires administrative bodies to abide by their rules until they are lawfully changed by law." *C & P Telephone Company v. Public Service Commission,* 171 W.Va. 708, 714, 301 S.E.2d 798, 804 (1983) (additional citations omitted); *see also Vitarelli v. Seaton,* 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); *Consumer Advocate Div. of Publ. Serv. Comm'n of West Va. v. Public Serv. Comm'n of West Va.,* 182 W.Va. 152, 157, 386 S.E.2d 650, 655 (1989). "This is especially true when an individual or company 'reasonably relied on agency regulations promulgated for his guidance or benefit and has suffered substantially because of their violation by the agency.'" *C & P Telephone,* at 714, 301 S.E.2d at 804 (quoting *United States v. Caceres,* 440 U.S. 741, 752–53, 99 S.Ct. 1465, 1471–72, 59 L.Ed.2d 733 (1979)).

8. An agency's interpretation of its own regulations is generally considered to be controlling unless it is plainly erroneous or inconsistent with the regulations. *United States v. Boynton,* 63 F.3d 337 (4th Cir.1995).

9. The Bureau's interpretation of the baseline data requirements set forth in Section 541 of the Medicaid Provider Manual is plainly erroneous and inconsistent with Bureau's regulations and is not entitled to deference.

### A. STATUTORY VIOLATIONS

10. 42 C.F.R. § 447.205 provides:

(a) *When notice is required.* Except as specified in paragraph (b) of this section, the agency must provide public notice of any significant proposed change in its methods and standards for setting payment rates for services.

(b) *When notice is not required.* Notice is not required if—

(1) The change is being made to conform to Medicare methods of levels of reimbursement;

(2) The change is required by court order; or

(3) The change is based on changes in wholesalers' or manufacturers' prices of drugs or materials, if the agency's reimbursement system is based on material cost plus a professional fee.

(c) *Content of notice.* The notice must-

(1) Describe the proposed change in methods and standards;

(2) Give an estimate of any expected increase or decrease in annual aggregate expenditures;

(3) Explain why the agency is changing its methods and standards;

(4) Identify a local agency in each county (such as the social services agency or health department) where copies of the proposed changes are available for public review;

(5) Give an address where written comments may be sent and reviewed by the public; and

(6) If there are public hearings, give the location, date and time for hearings or tell how this information may be obtained.

(d) *Publication of notice.* The notice must-

(1) Be published before the proposed effective date of the change; and

(2) Appear as a public announcement in one of the following publications:

(i) A State register similar to the FEDERAL REGISTER.

(ii) The newspaper of widest circulation in each city with a population of 50,000 or more.

(iii) The newspaper of widest circulation in the State, if there is no city with a population of 50,000 or more.

11. The Bureau violated the regulation set forth in paragraph 8, *supra,* when it developed the flowchart and applied it to Pressley Ridge's Behavior Management Plans. The flowchart marked a significant change from lawfully promulgated Medicaid Provider Manual provisions since the flowchart required only quantified baseline data in approvable Behavior Management Plans, while the agency regulations contained in the Medicaid Provider Manual permitted both quantified and qualitative/descriptive baseline data to qualify for approval of services rendered and claims made.

12. Title 42 U.S.C. § 1396a(a)(37)(B) states that a State plan for medical assistance must:

[P]rovide for claims payment procedures which ... provide for procedures for prepayment and postpayment claims review, including review of appropriate data with respect to the recipient and provider of a service and the nature of the service for which payment is claimed, to ensure the proper and efficient payment of claims and management of the program[.]

13. Section 764.1 of the Bureau's Medicaid Regulations provides:

A provider may, within 30 days after receipt of a notice of an administrative action taken by the Department which affects his/her participation in the Medicaid Program or his/her reimbursement for services provided Medicaid recipients, request an administrative review conference. The request must be in writing, dated, signed, must set forth in detail the items in contention, and identify the provider representatives who will be present for the conference. Upon receipt of the request for an administrative review or conference, the Department will establish a mutually agreeable date and time for the review.

14. The Bureau violated the within federal regulation by refusing Pressley Ridge's request for an administrative hearing on the Bureau's decision to impose prepayment review of Pressley Ridge's Behavioral Management Services claims and to end payments indefinitely for those services represented by the claims.

15. Title 42 U.S.C. § 1396a(a)(30)(A) states that a State plan for medical assistance must:

provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan ... as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available to the general population in the geographic area[.]

16. Defendants violated this regulation when they developed the flowchart and implemented its new and more burdensome provisions retroactively against Pressley Ridge's Behavioral Management Services claims for reimbursement.

17. Title 42 C.F.R. § 455.23 provides:

Withholding of payments in cases of fraud or willful misrepresentation.

(a) Basis for withholding. The State Medicaid agency may withhold Medicaid payments, in whole or in part, to a provider upon receipt of reliable evidence that the circumstances giving rise to the need for a withholding of payments involve fraud or willful misrepresentation under the Medicaid program. The State Medicaid agency may withhold payments without first notifying the provider of its intention to withhold such payments. A provider may request, and must be granted, administrative review where State law so requires.

(b) Notice of withholding. The State agency must send notice of its withholding of program payments within 5 days of taking such action. The notice must set forth the general allegations as to the nature of the withholding action, but need not disclose any specific information concerning its ongoing investigation. The notice must:

(1) State that payments are being withheld in accordance with this provision;

(2) State that the withholding is for a temporary period, as stated in paragraph (c) of this section, and cite the circumstances under which withholding will be terminated;

(3) Specify, when appropriate, to which type or types of Medicaid claims withholding is effective; and

(4) Inform the provider of the right to submit written evidence for consideration by the agency.

(c) Duration of withholding. All withholding of payment actions under this section will be temporary and will not continue after:

(1) The agency or the prosecuting authorities determine that there is insufficient evidence of fraud or willful misrepresentation by the provider; or

(2) Legal proceedings related to the provider's alleged fraud or willful misrepresentation are completed.

18. Defendants violated this provision when they suspended payments to Pressley Ridge indefinitely for Behavioral Management Services. To avoid having to comply with the requirements of this provision, the Bureau cast its decision to suspend payments indefinitely as one authorized by 42 C.F.R. § 447.45(f), a section which relates to prepayment and postpayment review of claims. That provision does not authorize indefinite suspension of payments. Suspension of payments is authorized only by 42 C.F.R. § 455.23 and can be instituted only in accordance with its provisions.

### B. DUE PROCESS CONSTITUTIONAL VIOLATION

19. The Fourteenth Amendment prohibits a state from depriving a person of life, liberty or property without due process of law. Plaintiff's interest in receiving reimbursement for services to Medicaid recipients is a protectable property interest under the Fourteenth Amendment.

20. At a minimum, "due process requires that government officials refrain from acting in an irrational, arbitrary or capricious manner." *Pollnow v. Glennon*, 757 F.2d 496, 501 (2nd Cir.1985). Defendants acted arbitrarily and capriciously when they determined, contrary to the provisions of the Medicaid Provider Manual, only *quantified* baseline data could satisfy the baseline data requirements contained in the Medicaid Provider Manual. Defendants retroactively applied this new standard to plans submitted by Pressley Ridge and gave Pressley Ridge no legitimate explanation for their actions. Due process further requires that decisions regarding entitlements to government benefits must be made according to "ascertainable standards" that are applied in a rational and consistent manner. *See Holmes v. New York City Housing Auth.*, 398 F.2d 262, 265 (2nd Cir.1968). The evidence at trial established Defendants ignored the standards contained

in the lawfully promulgated agency regulations in favor of unreasonably restrictive standards implemented without the publication, public comment or notice required by federal regulations. Without notice, Defendants changed the rules of the game once the game had begun.

### C. EQUAL PROTECTION CONSTITUTIONAL VIOLATION

21. Regulatory classifications are valid under the equal protection clause whenever they bear a rational relationship to a legitimate state objective. *Regan v. Taxation with Representation*, 461 U.S. 540, 547, 103 S.Ct. 1997, 2001–02, 76 L.Ed.2d 129 (1983). Under this rational basis test, as long as the classification "has some reasonable basis, it does not offend the Constitution simply because the classification is not made with reasonable nicety or because in practice it results in some inequality." *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161–62, 25 L.Ed.2d 491 (1970).

22. A reasonable classification is one that is " 'not arbitrary' " and that is based " 'upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.' " *Reed v. Reed*, 404 U.S. 71, 76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971) (quoting *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 561–62, 64 L.Ed. 989 (1920)).

23. Defendants demonstrated no reasonable basis for designing and applying the mandates of the Hess flowchart solely to Pressley Ridge's Behavior Management Plan Development claims for reimbursement. In taking that action, Defendants violated Pressley Ridge's equal protection rights.

### III. CONCLUSION

To remedy the foregoing violations of Pressley Ridge's federal statutory and con-

stitutional rights, the Court **PERMANENTLY ENJOINS AND ORDERS** Defendants to review all of Pressley Ridge's Behavioral Management Services claims for reimbursement in accordance with the baseline data requirements set forth in the Medicaid Provider Manual. Specifically, the Bureau shall reimburse Pressley Ridge for all claims supported by either quantified or qualitative/descriptive baseline data as required by Section 541 of the Medicaid Provider Manual.

Plaintiff may file an appropriate motion for attorneys' fees pursuant to 42 U.S.C. § 1988 and Rule 54(d)(2), Federal Rules of Civil Procedure.[1]

The Court **DENIES** as moot any remaining pending motions.

---

1. Plaintiff's fee petition should, at a minimum, provide (1) dates work was performed, (2) a reasonable description of the work, (3) time expended on the work, and (4) an affidavit or affidavits showing the requested hourly rate is reasonable. The Court will determine reasonable attorneys' fees according to the factors articulated by our Court of Appeals in *Trimper v. City of Norfolk*, 58 F.3d 68 (4th Cir.1995).